**MALONE v. SUBURBAN TRANSIT CO.**

Civ. A. No. 1375.

District Court, E. D. South Carolina.

March 1, 1946.

860

Henry H. Edens, of Columbia, S. C., for plaintiff.

Douglas McKay and Paul A. Cooper, both of Columbia, S. C., for defendant.

WYCHE, District Judge.

The plaintiff, Mrs. Beatrice Malone, the wife of a soldier stationed at Fort Jackson, South Carolina, instituted this action in the United States District Court for the eastern district of South Carolina, to recover damages for personal injuries sustained by her as a result of having been struck, knocked down and run over by a bus of the defendant on Main Street in the City of Columbia, South Carolina, at about 6 o'clock p. m. on the 26th day of January, 1945. The cause was tried before me and a jury and resulted in a verdict for the plaintiff in the sum of $33,125, actual damages.

The matter is now before me on the motion of the defendant from judgment non obstante veredicto, and failing in that, for a new trial.

In its motion for judgment non obstante veredicto, the defendant contends that the plaintiff failed to make out a case of actionable negligence against the defendant and that the plaintiff was guilty of contributory negligence. In its motion for a new trial the defendant says that the verdict of the jury is excessive and that the finding of the jury is opposed to the greater weight of the evidence.

The plaintiff in her complaint alleges, in substance, that while she was crossing Main Street in the City of Columbia, South Carolina, in an easterly direction, on a green traffic light and in the pedestrian lane, she was struck, knocked down and run over by the bus of the defendant, crushing her left leg, tearing the flesh from her buttocks, inflicting severe abrasions and contusions about her head and body; that her life was endangered for weeks, and her left leg had to be amputated; that she was confined to the hospital for several months, requiring large quantities of medicine and drugs and the constant care of physicians and nurses, incurring tremendous expenses for the same, and during which time she suffered great pain both in body and mind; that she suffered the loss of her wages and a substantial decrease in her earning power; that for the remainder of her life she will be forced to walk with the aid of crutches and that she will henceforth be deprived of many of the pleasures of society and will continue to suffer pain and mental anguish, embarrassment and humiliation, all to her great damage, etc.

She alleges that her injuries and damages were caused by the negligence of the defendant in the following particulars:

(a) The defendant caused its bus to be driven from a position parallel to a bus which was parked adjacent to the curb of Taylor Street on the corner of Taylor and Main Streets, which manner of parking was in violation of the laws of the State of South Carolina and the ordinances of the City of Columbia, and which rendered inherently dangerous the entrance of the bus into Main Street from said point;

(b) The defendant had on its bus such a load of standing passengers as to obstruct the view of the driver as he turned into Main from Taylor Street, in violation of the laws of the State of South Carolina and the ordinances of the City of Columbia, and heedless of the safety of others then and there lawfully using said street;

(c) The defendant failed to yield the right of way to the plaintiff and other pedestrians using the pedestrian lane across Main Street at said time and in said place in violation of the laws of the State of South Carolina and the ordinances of the City of Columbia, and heedless of the safe-

ty of the said pedestrians then and there lawfully using said pedestrian lane;

(d) The defendant drove said bus at an excessive and dangerous rate of speed under the circumstances existing at said time and in said place, in utter disregard of the rights and safety of pedestrians then and there lawfully crossing at said place;

(e) The defendant failed to keep a proper lookout for pedestrians then and there lawfully crossing said Main Street at said time and in said place, in utter disregard of their rights and safety;

(f) The defendant failed to exercise any caution or care whatsoever for the safety of pedestrians then and there lawfully crossing Main Street;

(g) The defendant failed to keep the bus under proper control and management so as not to endanger the safety of the plaintiff and others lawfully using the pedestrian lane of said street at said time and in said place;

(h) The defendant failed to bring the bus to an immediate hault after knocking the plaintiff down, but drove the bus over her prone body, and continued so to drive the bus forward for a considerable distance from the original point of impact before bringing the bus to a stop;

(i) The defendant drove the bus in a manner contrary to the laws of the State of South Carolina and the ordinances of the City of Columbia, and utterly heedless of the rights and safety of pedestrians then and there lawfully crossing Main Street, with an over-capacity, vision-obstructing load, from an illegally and inherently dangerous parked position, so negligently and without diminishing the speed of the bus, or making any effort to avoid the plaintiff or others then and there lawfully using said pedestrian right of way, as to cause said injury and damage by knocking down and running over the plaintiff.

The defendant by its answer admits that at approximately the time and place referred to in the complaint a collision occurred between the plaintiff and the bus of the defendant, which resulted in serious and permanent injuries to the plaintiff, but denies the other material allegations of the complaint, and alleges as an affirmative defense, that the plaintiff was guilty of contributory negligence in that she walked into the side of the bus without keeping a proper lookout or exercising due care under all the circumstances.

The testimony discloses that before the accident plaintiff had been standing on the west side of Main Street on the corner of Main and Taylor Streets in the City of Columbia, South Carolina, waiting for the red traffic light to turn green so that she could proceed across Main Street in the marked crosswalk provided for pedestrians. Main Street runs north and south and is 70 feet wide from curb to curb; Taylor Street runs east and west and is 74 feet wide from curb to curb. There is a pedestrian lane, or marked crosswalk, 9 feet and 8 inches wide running from curb to curb across Main Street. This pedestrian lane runs through a safety zone approximately 5 feet wide located in the middle of Main Street. The sidewalk on the west side of Main Street is 14 feet and 8 inches wide. The sidewalk on the south side of Taylor Street is 11 feet and 4 inches wide. From the scene of the accident Main Street runs south directly toward the steps of the State Capitol. Pedestrian traffic at the corner of Taylor and Main Streets at the time of the accident was very heavy and congested. The bus of the defendant which knocked down and ran over the plaintiff, as hereinafter related, is 24 feet and 2 inches long, and 7 feet and 10 inches wide. Just before the accident it was double parked parallel to the curb facing east on the right-hand side of Taylor Street at the corner of Main and Taylor Streets. The front of defendant's bus, so parked, was at least 12 feet to the left of where plaintiff was standing waiting for the traffic light to change, and at least 15 feet behind her. The driver of defendant's bus was also waiting for the traffic light to turn green so that he could proceed on his regular route, which required traveling into the intersection of Taylor and Main Streets and turning southward on Main Street against the red traffic light. The defendant's bus and the plaintiff started traveling east when the traffic light facing them changed from red to green. The plaintiff proceeded, as she had the right to do under the city ordinances hereinafter recited, to cross Main Street in the pedestrian lane. As she started to cross she looked to see if there were any cars coming, seeing none she continued to cross Main Street until she was almost to the safety zone when the bus struck her. The driver of defendant's bus proceeded to drive it into the intersection of Main and Taylor Streets and swing it around south against the red light on Main Street, and in doing so knocked the plaintiff down and

ran over her leg with the rear wheel of the bus and inflicted upon her the serious and severe injuries described in the testimony of her physician. In order to make the turn it was necessary for the bus to travel east into the intersection of Main and Taylor Streets and for the front wheels of the bus to make a sweeping turn on a wide arc to the right with much less movement by the rear wheels of the bus in making the swinging turn. Plaintiff was struck while in the pedestrian lane near the safety zone while the bus was in the process of swinging around and was thrown about 14½ feet toward the south, and diagonally toward the west curb of Main Street. Traffic officers who investigated the accident shortly after its occurrence, but subsequent to the removal of the plaintiff to the hospital, found blood stains, bits of flesh and clothing crushed into the asphalt paving on Main Street at a point 23 feet from the west curb of Main Street and south of the pedestrian lane at a distance of 14½ feet from the center of the pedestrian lane. As to which part of the bus struck the plaintiff, the testimony varies. One witness indicated on a photograph of the bus a point on the front door near the front of the bus as the part of the bus which struck the plaintiff. Other witnesses placed it from within the first quarter of the bus to the middle of the bus. There was one witness who testified that the bus attracted his attention when the driver "gave the bus the gun", that is, pressed on the accelerator to make the bus go faster, as he was "making a sweep around the corner." Another witness testified that the bus ran 40 feet after it hit the plaintiff. Plaintiff testified that the bus struck her on the left side of the head and knocked her down, that when she looked to see what had hit her, she saw the front end of the bus and people standing up so that she could not see the driver. Some of the other witnesses testified that the bus was not over-loaded.

The plaintiff introduced the following city ordinances:

"Whenever traffic is controlled by traffic controlled signals exhibiting the words, 'Go,' 'Caution,' or 'Stop,' or exhibiting different colored lights, successively one at a time, the following colors only shall be used, and said terms and lights shall indicate as follows:

"(a) Green alone, 'Go.'

"1. Vehicular traffic facing the signal may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. *But vehicular traffic shall yield the right of way to other vehicles and to pedestrians lawfully within the intersection at the time such signal is exhibited.* (Emphasis added.)

"2. *Pedestrians facing the signal may proceed across the roadway within any marked or unmarked crosswalk.*" Emphasis added.)

"(a) Every pedestrian crossing a roadway at any point other than within a marked crosswalk, or unmarked crosswalk at an intersection, shall yield the right of way to all vehicles upon the roadway."

"(c) Between adjacent intersections at which traffic control signals are in operation, pedestrians shall not cross at any place except in a marked crosswalk.

"(d) Notwithstanding the provisions of this section, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway, and shall give warning by sounding the horn when necessary, and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway."

"No person shall drive a vehicle when it is so loaded, or when there are in the front seat such number of persons exceeding three, as to obstruct the view of the driver to the front or sides of the vehicle, or as to interfere with the driver's control over the driving mechanism of the vehicle."

The plaintiff introduced the following South Carolina state statutes:

"(2) Speed restrictions.—(a) No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions then existing.

\* \* \* \* \* \*

"(d) The fact that the speed of a vehicle is lower than the foregoing limits shall not relieve the driver from the duty to decrease speed *when approaching and crossing an intersection,* when approaching and going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, or *when special hazard exists with respect to pedestrians* or other traffic or by reason of weather or highway conditions, and speed shall be decreased as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in

compliance with legal requirements and the duty of all persons to use due care." Section 1616, Code of Laws of South Carolina 1942. (Emphasis added.)

The South Carolina Supreme Court has declared that where a motion is made for a directed verdict the testimony and all reasonable inferences adducible therefrom must be considered in the light most favorable to the party against whom the motion is made, and it is not the province of the court to weigh testimony but simply to determine if there is any relative, competent testimony adduced from which a reasonable inference may be drawn tending to establish the material elements of the plaintiff's cause of action. Hyman v. Carolina Veneer Lumber Co., 194 S.C. 67, 9 S.E.2d 27; Whisenhunt v. Atlantic Coast Line R. Co., 195 S.C. 213, 10 S.E.2d 305.

If more than one reasonable inference can be drawn from the testimony, it is the duty of the trial judge to submit the cause to the jury. Crosby v. City of Chester, 197 S.C. 66, 14 S.E.2d 552; McGuire v. Steinberg, 185 S.C. 97, 193 S.E. 205.

Viewing the testimony in this case in such light, it is my opinion that there was substantial testimony introduced at the trial from which the jury could have reasonably concluded that the defendant was guilty of negligence, as alleged in the complaint, and that such negligence was the proximate cause of plaintiff's injuries.

It is not possible to lay down any precise rule by which to determine whether the question of contributory negligence is to be decided under the evidence as a conclusion of law or should be submitted to the jury as a question of fact. The determination of this question must necessarily be controlled by the facts and circumstances of the particular case. A court will not decide it as one of law if the testimony be conflicting, or if the conclusion to be drawn therefrom is doubtful or uncertain; under such circumstances the question clearly falls within the province of the jury. Bingham v. Powell, 195 S.C. 238, 11 S.E.2d 275.

Before I can judicially declare the plaintiff to have been guilty of contributory negligence, I must give due consideration not only to all reasonable inferences of fact tending to support the opposite view, but also to the presumption that she exercised ordinary care for her own safety; the evidence must show some decisive negligent act on the part of the plaintiff which directly contributed to her injuries as a proximate cause thereof, and that this negligent act was so decisive in character as to leave no room for difference of opinion thereof by reasonable minds; the act must be distinct and decisive and one about which ordinary minds would not differ in declaring it to be both negligent and the proximate cause of the injuries. Where the nature and attributes of an act relied on to show negligence contributing to an injury sustained as a proximate cause thereof, can only be determined correctly by considering all the attending and surrounding circumstances of the accident, it falls within the province of the jury to pass upon and characterize it and it is not for me to determine its quality as a matter of law. White v. State of Maryland, 4 Cir., 106 F.2d 392; Murray v. Martin, 188 S.C. 334, 199 S.E. 301; Norwood v. Atlantic Coast Line R. Co., 203 S.C. 456, 27 S.E.2d 803; Ford v. Atlantic Coast Line R. Co., 169 S.C. 41, 168 S.E. 143.

Under the evidence in this case, I cannot say, as a matter of law, that the plaintiff was guilty of contributory negligence as the proximate cause of her injuries. The jury could have reasonably concluded from the testimony that the defendant was guilty of negligence in failing to use due care under all the circumstances, as well as through its failure to observe the city ordinances and the state statutes. At the time of the accident the plaintiff was where she had a right to be, that is, she had the right to cross the street in the pedestrian lane on a green light at that point if she so desired, exercising, of course, due care for her own safety. The defendant was bound to use such care as the situation or circumstances demanded, and under the city ordinances of the City of Columbia it was the duty of the driver of the bus to yield the right of way to the plaintiff, who was lawfully within the intersection at the time the green traffic light was exhibited, and when the accident occurred. A driver of a dangerous machine "when turning at the angle of two intersecting streets or roads, should strictly obey the law and exercise that degree of care generally which is commensurate with the great hazard produced by failure to do so." Crouch v. Cudd, 158 S.C. 1, 155 S.E. 136, 140.

For the foregoing reasons, the motion for judgment non obstante veredicto will be denied.

 In its motion for a new trial the defendant argues that the verdict of the jury for $33,125, actual damages, is excessive. With this contention I cannot agree. Dr. Theodore J. Hopkins clearly describes plaintiff's injuries, in part, as follows: "When I saw her she was in the emergency room of the Columbia Hospital lying on an ambulance stretcher. She was in a profound degree of shock. She was cold, clammy, but perfectly conscious. She had a badly crushed mangled leg. The leg was crushed from the ankle to above the brim of the pelvis. The skin was reflected back as if you had taken scissors and cut your trousers leg and turned it to one side to above the brim of the pelvis, extending into the left flank. The tibia, the skin bone, was crushed into many pieces. The muscles were mangled and the blood vessels were cut and spurting blood everywhere. The knee joint was also crushed and the femur, which is the large bone from the hip to the knee, was badly crushed to about six or eight inches above the knee. The pelvis gave evidence of being crushed in many places. Mrs. Malone was in a very critical condition and we expected her to die momentarily. Blood plasma was given. Several units of blood plasma were given and then Mr. Morelli, the soldier that was on the stand a few moments ago, volunteered to give some whole blood until we could get some other donors together to collect some blood for her. She was given a whole blood transfusion in the emergency room and carried to surgery where her leg was amputated in the high mid thigh. She was given one or two pints further of blood while on the operating table and we never expected her to get off the operating table. You could run your hand in above the pelvis. You could feel the intestines and the abdominal viscera through the thin peritoneum lining of the abdominal cavity. It did not rupture into the abdominal cavity. The left kidney was palpated. And the pelvic bones could be manually manipulated from side to side. A quantity of sulfanilamide powders was inserted in the compound wound and also seven hundred thousand units of penicillin were placed directly in the wound and the wound was closed in a loose fashion with rubber drains. This lady also had the flesh taken off both buttocks about the size, I would say, of a large cantaloupe. Both buttocks were completely denuded. There was nothing we could do for that any more than place a dressing on those. And she was put to bed and transfused I think once or twice more during the evening and given fluids for several days in the vein. And several other blood transfusions were given. She was in a critical condition for two or three weeks at, you might say, the point of death. And for two months she ran a very elevated temperature, as the chart here will show; and during the first several weeks, as I recall, of her illness she was unable to use the customary bedpans on account of these sores on her buttocks and it was necessary to give her very close attention. And if it had not been for the services of her three very competent nurses I don't think she would have been able to pull through, and she remained in the hospital for six months I think it was. About July or the latter part of June she was dismissed from the hospital, at which time the skin over the stump was not healed and it was necessary to dress both buttocks. The skin which had been flapped back around the amputated stump became gangrenous over an area probably as large as the palm of your hand and this sloughed out during the first few weeks at the hospital. And of course during all of this time large quantities of penicillin was given and I think we gave her—we have a record here—some five million nine hundred and forty-five thousand units were given over a period of a month or more. I would like to state that X-rays were made the day following the accident by a portable X-ray machine because she couldn't be moved out of the bed. And it confirmed the many fractures in the pelvis. Of course, a lot of them were overlapping, because there is very little you can do for a pelvic fracture, particularly when some one is as critically ill as she was. * * * As to any industrial employment I believe she is totally and permanently disabled and also I believe she is totally and permanently disabled to perform the duties of a wife or mother. I believe that she will have to more or less always be dependent on someone to look out for her."

Annie C. Patton, one of the three attending nurses, testified to the physical and mental suffering of the plaintiff, to the failure of narcotic drugs to ease her pain, her inability to use a bed pan, the sloughing off of dead tissues, the terrible odors and pain that emanated therefrom, about her screams, all in detail as will fully appear from her testimony. She testified further that after about three months she was put in a wheel chair, but she couldn't sit with-

out pain. "She had to sit in the rolling chairs on pillows and air rings. But she had to do like this. (Indicating.) She had to press on her arms to sit up but still she wanted to sit up every day and we wanted her to sit up. And of course all that oozing and bleeding from the buttocks was getting better all the time but that was about as much agony as the stump."

In addition to her loss of time, pain and suffering, total and permanent disability, plaintiff incurred liability for over $5,000 in medical, hospital and nurses' bills. Since she was sixteen years of age she had earned approximately $100 per month in various forms of employment, and was employed at the time of her injury at $16 per week. Her expectancy is approximately thirty-three years.

Courts have, and sometimes exercise, the power to set aside verdicts on the ground of excessiveness, yet it is a power to be cautiously used. Courts in general are most reluctant to disturb a jury's verdict on the ground of excessiveness where the damages are unliquidated and there is no fixed measure of mathematical certainty. This is particularly significant with respect to damages in tort actions for personal injuries. The texts and the authorities are consistent in holding that a verdict of the jury will not be set aside as excessive unless it be clearly shown that the jury either disregarded the instructions of the court or was influenced by passion, prejudice or corruption, or other improper motives. However, it may be expressed by a court, summarized, the rule is that, the trial judge will not interfere with a jury's verdict simply because it is greater than his own estimate; only where the verdict is so grossly excessive as to shock the conscience of the court and clearly manifest that it was the result of caprice, passion, partiality, prejudice, corruption, or other improper motives, will the court intervene; and the theory always is that a court will not set aside a verdict on this ground in an action of this character except in extreme and exceptional cases.

In determining whether a verdict is excessive it must be remembered that the maximum amount which a jury might properly award as damages under the evidence in a personal injury case cannot be determined with any degree of certainty, and must be largely a matter of judgment; the view most favorable to the plaintiff must be inferred from the evidence, and if there

is substantial evidence to sustain the verdict it will not be disturbed. Jones v. Atlantic Refining Co., D.C., 55 F.Supp. 17.

It is my opinion that the verdict of the jury is not excessive, and I cannot say that the finding of the jury is opposed to the greater weight of the evidence. For the foregoing reasons the motion for a new trial is overruled.

Order will be filed herewith accordingly.