15587

NORWOOD v. ATLANTIC COAST LINE R. CO. *ET AL.*

(27 S. E. (2d), 803)

January, 1943.

*Messrs. Dargan & Paulling,* of Darlington, S. C., *Mr. John F. Wilmeth,* of Hartsville, S. C., and *Messrs. Woods & Woods,* of Marion, S. C., Counsel for Appellants,

*Messrs. Mozingo & Watts,* of Darlington, S. C., Counsel for Respondent,

November 22, 1943.

CIRCUIT JUDGE E. H. HENDERSON, ACTING ASSOCIATE JUSTICE, delivered the unanimous Opinion of the Court:

John A. Norwood was killed when the automobile in which he was riding came into collision with a freight train of the Atlantic Coast Line Railroad Company at the Washington Street crossing in the town of Darlington. This action for wrongful death was brought by the administratrix for the benefit of his widow and children, and was tried before his Honor, Judge G. B. Greene, and a jury in the Court of Common Pleas for Darlington County, resulting in a verdict in favor of the plaintiff for $35,000.00 actual damages.

The plaintiff in her complaint contended that the defendants, the railroad company and its engineer, were negligent and willful in failing to keep a proper lookout, in running the train at a dangerous rate of speed, in failing to give the statutory signals or any warning of the approach of the train, in maintaining an unsafe and dangerous crossing by placing certain freight cars on a nearby side track, and in failing to stop the train after observing the automobile.

The answer denied the material allegations of the complaint, and alleged that the deceased and the driver of the automobile were engaged in a joint and common enterprise, and that both of them were guilty of such contributory negligence and such gross and willful contributory negligence and willfulness as to defeat a recovery.

At the conclusion of the testimony the trial Judge. in refusing a motion for a directed verdict, ruled that under the evidence the occupants of the automobile were engaged in a common enterprise. Any negligence or willfulness of the driver would therefore be imputed to the plaintiff's intestate.

The driver also had "charge of his person," under the crossing statute.

Although there are twelve exceptions, they may be grouped in such a way that only four grounds for a reversal of the judgment are assigned: (1) Error in refusing to direct a verdict for the defendants on account of the failure of proof by the plaintiff of her cause of action; (2) in refusing to direct a verdict for the defendants on account of contributory negligence, recklessness and willfulness of the decedent and the driver of the automobile; (3) in admitting in evidence certain probate records, and in holding that they were sufficient; and (4) in not seeking to reduce the verdict on the defendants' motion for a new trial.

There was a sharp conflict in the evidence as to the giving of the statutory signals, the giving of warning under the common law, the speed of the train, and the presence of freight cars on the side track. The defendants' witnesses testified positively that the signals were properly given, that the train was moving at a speed of about fifteen miles an hour at the crossing, and that there were no cars at all on the side track. However, we think that there was evidence on the part of the plaintiff as to the operation of the train and the failure to give the statutory signals, as pointed out below, which required the submission to the jury of the issues of negligence and willfulness.

In view of the positive evidence of the plaintiff's witnesses we are required under well-recognized rules to consider that there was a neglect in giving the statutory signals and as a result the company would be liable unless it is shown that either the intestate or the driver of the automobile was guilty of "gross or willful negligence," contributing to the injury as a proximate cause. Code § 8377. So the decisive question is: Does the evidence, together with the reasonable inferences therefrom, show as a matter of law that either Mr. Norwood or the driver of the automobile was guilty

of such gross or willful negligence contributing to the injury?

The collision occurred at about 9:45 P. M., on March 31, 1941. The railroad company has at the Washington Street crossing three tracks, the main line being in the middle with a track on either side. The train was a freight train running from Hartsville to Florence and consisting of an engine and eighteen cars, one of which was the caboose.

The main line of the railroad comes into Darlington from a northerly direction, curves to the east or left and comes out from behind the passenger station, which is located near the Broad Street crossing. The track there straightens out and proceeds to Washington Street, 289 feet distant, which it crosses at an angle of 132 degrees, approximately from the northwest to the southeast.

The Timmonsville highway enters the town on Washington Street and runs substantially north and south. This section of town is thickly populated. Approaching the crossing from the south, or Timmonsville, side there is a continuous row of houses, trees, and shrubbery for two and a half blocks on the left of the highway, the last building being a large store occupied by James Epps. The plaintiff's witnesses testified that at the time of the collision two box cars and a gondola were parked on the side track south of the main line, from five to seven feet from the edge of the left side of the highway. Though this is vigorously denied by the defendants, as an appellate Court for the correction of errors of law we must accept all the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff, and so we must assume that the cars were on the side track. These houses, trees, shrubbery, and freight cars presented a continuous obstruction to the view of a traveler to his left until the freight cars were passed.

The freight train was from two to three hours behind its usual time, and plaintiff's witnesses said it was running from forty to forty-five miles an hour. As the train came around the curve beyond the passenger station, the headlight of the locomotive shone upon the Epps store, and did not shine down the track until the engine straightened out at about Broad Street. There is a street light located in the Washington Street intersection a few feet south of the main line on the right of the highway which tended to interfere with a traveler observing the train's headlight shining on the rails. There was evidence that the headlight was not bright, but was a "yellowish" light.

Hazel Norwood, the driver, a son of the deceased, knew of the crossing, and had slowed down to pass it. It appears that he had never been across it before that day. Besides John A. Norwood and the driver, two other men were riding in the automobile, which was a 1937 single seated Dodge coupe. The intestate was sitting in the middle, Wilson C. Norwood on the right, with Mason Melton sitting in his lap. All were good-sized men. They had driven from their home near Hartsville, through Darlington, and to the store of a Mr. Wilcut, a short distance south of Darlington on the Timmonsville highway, and in going there they had passed over the Washington Street crossing at which the collision later occurred, Mason Melton then driving.

Upon returning soon thereafter by the same route to Darlington on their way home, traveling in a northerly direction on Washington Street, the automobile had slowed down near the town limits and was proceeding at about ten to twelve miles an hour as it entered the right-of-way of the railroad company. The car was under control, the left-hand window was open, and the testimony of plaintiff's witnesses is that the driver looked both ways and listened for an approaching train before proceeding to the main line. They testified that the train could not be seen and that no signals were given, by either ringing the bell or

blowing the whistle. The weather was a little foggy and misty.

James Epps, standing in front of his store, saw both the train and the automobile coming, and waved and shouted a warning to the occupants of the automobile; but evidently they did not see or hear him. There was testimony that an automobile moving at a speed of ten or twelve miles an hour can be stopped in fifteen to twenty feet.

The plaintiff's witness said that when they had passed the obstruction made by the freight cars on the siding, they were then "right on" the main line. The engineer stated that he did not see the automobile until the locomotive was about fifty feet from Washington Street. While there was some testimony that the distance between the side track and the main line was only fifteen or twenty feet, the plat which is in evidence shows a distance of seventy-three and one-half feet, measuring from the center of each track. However, when the driver had reached a place where he could see beyond the box cars, the distance from the front part of the automobile to the point where it would strike a train on the main line was less than sixty feet, in view of the distance between the northern rail of the side track and the southern rail of the main line, the several feet distance between the front of the automobile and the place where the driver sits, and the fact that the width of both the train and of the box cars extended beyond the rails on either side. Only a few seconds elapsed from the time the automobile got past the freight cars until the collision occurred.

Although the obstructions made it impossible for a driver to see the train approaching from his left, as this train was doing, until he had passed the side track, after clearing the box cars there was an unobstructed view in the daytime of six hundred feet up the main line to the passenger station and beyond it around the curve before the view was cut off by the station. If the box cars had not been there, there would

have been an unobstructed view to the left after passing the Epps store, which is one hundred forty-eight and one-half feet from the main line.

The front of the locomotive and the automobile came into collision, and the automobile was carried down the track for a distance of about one hundred yards before the train was stopped, both Mr. Norwood and the driver of the automobile, Hazel Norwood, being killed as a result of the collision.

There is no difficulty as to the legal principles governing the duty of a traveler upon a highway in approaching a railroad crossing, as many cases of this Court have clearly stated the law covering such situations.

In the very recent case of *Cook v. Atlantic Coast Line Railroad Company,* 196 S. C., 230, 13 S. E. (2d), 1, 5, 133 A. L. R., 1144, the Court said:

"In the last mentioned case of *Carter v. Atlantic Coast Line R. Co.,* 194 S. C., 494, 10 S. E. (2d), 17, 20, the applicable rule is thus stated: 'A rule firmly established by the foregoing cases is that a traveler on reaching a railroad crossing and before attempting to go upon the track, must use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances; he must look and listen in both directions for approaching trains; if not prevented from so doing by the fault of the railroad company, and to the extent the matter is under his control, he must look and listen at a place and in a manner that will make the use of his senses effective. Another principle which the cases sustain is that the duty of a traveler arising under the foregoing rule is not an absolute one, but may be qualified by attendant circumstances. See *Chisolm v. Seaboard Air Line Ry., supra,* 121 S. C., 394, 114 S. E., 500.'

\*    \*    \*

"The rule is that a traveler is not bound to see or hear, but is bound to make all reasonable effort to see and to hear that an ordinarily prudent man would make under like circumstances."

In the case of *Harrison v. Atlantic Coast Line Railroad Company*, 196 S. C., 259, 13 S. E. (2d), 137, 140, the following statement is made: "If, in case of an accident at a crossing, it appears that the person injured did look for an approaching train, it would not necessarily follow as a rule of law that he was remediless because he did not look at the precise place and time when and where looking would have been of the most advantage. Many circumstances might be shown which could properly be considered, by the jury in determining whether the deceased exercised due and reasonable care in making his observations. The presence of obstacles obstructing the view, and other diverting influences, may be considered in determining whether the person injured did in fact look and listen before attempting to cross the track, and fairly discharged the duty imposed upon him, even though it should appear that if he had looked at another instant of time or from another point he would have seen the train."

It was further said: "In the absence of some evidence to the contrary we think the Harrisons had the right to presume that the defendants would obey the state law and would give the statutory signals upon approaching the crossing; and, while the wrongful conduct of the defendants in this regard would not excuse the Harrisons from the exercise of slight care, yet in determining whether they did use such care their conduct is to be judged in the light of such presumption."

The law is equally clear as to the part to be performed by the trial Judge, and by the jury, in determining whether the traveler measured up to the standard of duty required of him.

In the *Harrison case,* above, it was stated:

"Where one approaching a railroad crossing of the kind above indicated is injured, and the facts and circumstances are not controverted and the reasonable inferences from such facts and circumstances are unequivocal, and can lead but to one conclusion, the Court will declare, as matter of law, whether the party injured was guilty of contributory negligence. But in practice it often occurs that the facts and circumstances surrounding a particular case are such as to warrant different inferences, so that one impartial, sensible man may draw the inference and conclusion that the injured party was guilty of negligence, while another man, equally as impartial and equally as sensible, might draw a different conclusion, and in such cases the Court will not adjudge the question of negligence, but will leave it to the jury under proper instructions. However, the question presented by this appeal is not whether the Harrisons exercised ordinary care, but whether they failed to exercise slight care, and hence were guilty of gross or willful negligence, contributing as a proximate cause of the injury.

\* \* \*

"It is firmly established in this jurisdiction that if the inferences properly deducible from the evidence are doubtful, or if they tend to show both parties guilty of negligence or willfulness, and there may be a fair difference of opinion as to whose act produced the injury complained of as a direct and proximate cause, then the question must be submitted to the jury. *Ford v. Atlantic Coast Line Railroad Co.,* 169 S. C., 41, 168 S. E., 143."

Applying these principles of law to the facts of the present case, and taking into consideration the evidence as to the obstructions, the speed of the train, the absence of signals, the weather conditions, the darkness of the night, the curve in the railroad, the short distance and

the few seconds of time of unobstructed vision, the street light, and the fact that the driver did look and listen and did not see or hear the train, we conclude that there was a reasonable inference which could be drawn from the evidence that the deceased and the driver were not guilty of a failure to exercise at least slight care. It was a question for the jury, in the circumstances, to say whether or not the decedent or the driver was guilty of gross or willful negligence. Under applicable rules, we cannot determine that question as a matter of law. Whether they could have seen and heard the train, and whether they looked and listened at the proper place, were issues for the jury.

Turning now to a consideration of the probate records, as proof of her appointment as administratrix of the estate of John A. Norwood, the plaintiff offered in evidence the judgment roll of the Probate Court relating to this estate. The petition for temporary administration and the letters which were granted were dated in April, 1941. The affidavit of the petition was probated April 26, 1941, and on that day the administratrix filed a bond.

When this record was offered in evidence, the defendants objected to it on the ground that it showed that the Judge of Probate was without jurisdiction to grant the letters for the reason that there had been no citation to the kindred or creditors of the intestate issued or published; that the bond did not comply with the statutory requirements; and that if the purported letters of administration were temporary they were invalid for the reason that no application for permanent administration had been made or citation published.

The defendants' objections were overruled and the roll was admitted in evidence. The point as to the sufficiency of the record was also made by the defendants in motions for a nonsuit and a directed verdict.

In our opinion this objection is without merit, and we think that it clearly appears that the administratrix is qualified to maintain the action and to give a valid release of the judgment so as to bar forever another action in this matter.

Section 8973 of the Code provides for the issuance of temporary letters of administration. It authorizes and directs the Judges of Probate, upon an *ex parte* petition, to grant such letters, pending the publication of citation or the taking of other requisite legal steps, without giving notice of such temporary appointment. The petitioner is required to enter into such bond as the Judge of Probate may fix or as is required by law for permanent letters. The statute then reads: "Upon the granting of such temporary letters the person to whom such letters are issued shall have all the powers now conferred upon an appointee after legal citation."

Under this statute it was not necessary that a citation be published in order to qualify the plaintiff as a holder of temporary letters, since the act specifically provides for appointment without notice. It would seem to make no difference that the letters which were issued did not definitely state that they were temporary ones. As only temporary letters could be issued without publishing a citation they should be construed and interpreted as such letters. The bond which was placed in evidence complied with the provision that the appointee should enter into such bond as the Probate Judge may fix.

We think, then, that the evidence shows that the plaintiff was legally appointed as temporary administratrix and as such had all the powers which were conferred by the statute.

Since the record is silent as to whether or not a petition has been presented or citation published for permanent administration, we think that it may be

presumed, upon collateral attack, that all acts necessary to sustain the jurisdiction of the Court have been done. The statute contains no limitation as to the time in which permanent letters should be granted, and in the meantime gives full authority to the appointee. The Court of Probate, though of limited jurisdiction, is a court of record with large powers, and is not to be regarded as an inferior court in respect to the dignity of its records. *Hendrix v. Holden,* 58 S. C., 495, 36 S. E., 1010.

No collateral attack may be made upon the granting of administration in the Probate Court, unless a lack of jurisdiction affirmatively appears on the face of the record, as distinguished from the record being merely silent. *Dunlap v. Savings Bank,* 69 S. C., 270, 48 S. E., 49, 104 Am. St. Rep., 796; *Ellenberg v. Arthur,* 178 S. C., 490, 183 S. E., 306.

The record here shows no lack of jurisdiction of the Probate Court, and no invalidity of the temporary letters.

As to the size of the verdict we cannot say that the Circuit Judge was in error in failing to seek to reduce it by means of an order for a new trial *nisi.* As has been held in many decisions, this Court will not revise the action of a Circuit Judge in matters of this kind, unless there has been an abuse of discretion.

It appears from the testimony that John A. Norwood was forty-nine years of age at the time of his death. He left a widow and five children, the youngest being fourteen years of age. While the testimony is not full as to his income, it does appear that it was between $3,000.00 and $4,000.00 a year. Some of his children were married and lived apart from him, but whenever they needed money he provided them with it. It is alleged in the complaint that he enjoyed the love and devotion of his family as a father and husband and that his death caused his beneficiaries' extreme mental anguish, grief, and loss of a means of financial sup-

port, fatherly love, and advice. These allegations are borne out by the evidence. In the case of *Mishoe v. Atlantic Coast Line Railroad Company*, 186 S. C., 402, 197 S. E., 97, it is said that among other elements which may be considered by the jury in assessing damages in cases of this kind are pecuniary loss, mental suffering, grief and sorrow, loss of companionship, and loss of the intestate's experience, knowledge, and judgment in managing the affairs of his beneficiaries. It is quite impossible to fix with anything approaching mathematical certainty the damages which one may suffer from the wrongful death of a father or husband, or to place a measure upon the grief which accompanies it. It is our opinion that the verdict, while undoubtedly quite large, is not so excessive or so wholly unsupported by the evidence as to show an abuse of discretion upon the part of the Circuit Judge in failing to attempt to reduce it, or to indicate that the verdict was based upon caprice, passion, or prejudice.

All of the exceptions are overruled and the judgment of the Circuit Court is affirmed.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE, and STUKES, and CIRCUIT JUDGE T. S. SEASE, ACTING ASSOCIATE JUSTICE, concur.