16228

JENNINGS v. McCOWAN *ET AL.*

(55 S. E. (2d) 522)

*Messrs. Dargan, Paulling & James,* of Darlington, *John F. Wilmeth,* of Hartsville, *and Woods & Woods,* of Marion, *for Appellants,*

*Messrs. Tison & Miller and N. Walser Edens,* of Bennettsville, *and Mozingo & Watts and J. P. Gardner,* of Darlington, *for Respondent,*

408

*Messrs. Dargan, Paulling & James,* of Darlington, *John F. Wilmeth,* of Hartsville, *and Woods & Woods,* of Marion, *for Appellants, in reply,*

June 10, 1949.

TAYLOR, Justice.

Action in this case was commenced on January 22, 1948 by respondent, G. B. Jennings, as Administratrix of the Estate of Luther W. Carter, deceased, against W. J. McCowan, G. R. Mims, O. K. Scott and Atlantic Coast Line Railway Co., in the Court of Common Pleas for Darlington County, wherein she demanded judgment against the defendants for the sum of $100,000.00 damages, arising out of the death of the intestate L. W. Carter, as the result of injuries sustained by him in a collision of one of defendant's railway company trains with a Chevrolet coach being driven in a northerly direction along U. S. highway 15-A at Society Hill, S. C. The complaint alleged that the collision and resulting death of the intestate, L. W. Carter, were due to the negligence, recklessness, willfullness, wantonness and unawful acts of the defendants in certain particulars.

Defendant, O. K. Scott, fireman of the train, was never served with the complaint or summons and the trial judge

directed a verdict as to W. J. McCowan, the conductor of the train. The defendants, G. R. Mims and Atlantic Coast Line Railway Co., after admitting certain parts of the complaint and denying others set up by way of affirmative defenses, contributory negligence, recklessness, willfullness and wantonness on the part of the deceased, Luther W. Carter.

The case was tried before Honorable J. Woodrow Lewis, presiding judge of the Court of Common Pleas, Darlington County, and a jury on May 12, 1948. Appellants made timely motions for a nonsuit and directed verdict which were refused. The case was then submitted to the jury which rendered a verdict for the respondent in the sum of $70,-000.00 actual damages and $15,000.00 punitive damages, appellants then moved for judgment *non obstante veredicto* or for a new trial in the alternative, which was also refused.

Appellants now appeal to this court and we will consider the questions raised, in the order appellant does in his brief. The first question is whether or not any or all of appellants' motions for nonsuit, directed verdict, judgment *non obstante veredicto* or a new trial in the alternative should have been granted.

It is well settled that in determining whether or not there was error in refusing to grant motions for a nonsuit or directed verdict we must adopt the view of the evidence most favorable to the verdict and give it the strongest probative force of which it will admit. *Langston v. Atlantic Coast Line R. Co. et al.,* 197 S. C. 469, 15 S. E. (2d) 758; *Haselden v. Atlantic Coast Line R. Co. et al.,* 1949, 214 S. C. 410, 53 S. E. (2d) 60.

Plaintiff's intestate, a man fifty-six years of age, while traveling north on highway 15-A near Society Hill in Darlington County, S. C., on the 29th day of January, 1946, at approximately 6:30 P. M., approached the point at which the defendant railway company's tracks (main track and spur track) cross said highway at which they maintain auto-

matic lights and stop signals. The tracks being parallel and approximately thirteen feet apart the automatic stop signal serves both tracks. Deceased was familiar with this crossing in that he was employed by the defendant railway company as bridge or trestle builder and for sometime prior had traveled this route twice daily from Bennettsville, S. C., where he maintained his residence. On this occasion it was dark but the weather was fair. The engine involved in the accident operated from Wadesboro, N. C., to Florence, S. C., and was engaged in shifting operations at the time of the collision. All cars having been disconnected from the train except one car loaded with brick ·which was being shifted from the brickyard to the main line where the rest of the train was located, deceased was driving on the right side of the highway and struck the engine approximately where the pilot and engine join, bending the step located at the front end of the cylinder, the pilot lacking about three feet of reaching the opposite side of the paved portion of the highway.

Mrs. Dalrell Odom, the only eyewitness not connected with either party, testified that she lives and operates a filling station immediately adjacent to this crossing and that on the night in question she was in front of the filling station and witnessed the collision, that the engine with one car attached came from the left and neither blew the whistle nor rang the bell as it approached the highway. That she had had about fifteen years experience driving a car and she estimated that the deceased Mr. Carter was driving at approximately 25 miles per hour and was "slowing down all the time". That the train was traveling approximately 35 miles per hour. That immediately prior to the collision the signal lights were not operating. That she lived there approximately twenty-three months prior to the collision and had ample opportunity to observe the operation of the signal lights and they come on when the train is "almost on the highway", when operating on the spur track (as it was on this

occasion). That she was drawing a gallon of kerosene from the tank and hearing a car on the highway looked and saw Mr. Carter look up and down the tracks before attempting to cross, at the same time slowing down. That the train could not be seen by one traveling along the highway until a point in front of the filling station had been reached and that there is only a narrow dirt road which leads to the Atlantic Coast Line Railway depot between the filling station and the railroad right of way. She further testified that the headlight on the train was an "orange color * * * it was a dim light; it was not bright." A portion of Mrs. Odom's testimony appears as follows:

"Q. Now will you describe for the benefit of the court and jury where your station is located? A. Well, as you leave Society Hill going towards Bennettsville on U. S. 15-A, you pass several houses sitting on the left and a pine thicket behind those houses before you reach the Shell station where I was operating and there is a railroad right there.

"Q. The Shell station you were operating and those houses and pine thicket you are talking about going towards Bennettsville from Society Hill, will you tell us what side of the road that is on? A. It is on the left.

"Q. What direction was the train coming from that collided with the auto in which Mr. Carter was riding? A. On the left coming from that direction towards the railroad track.

"Q. Will you tell us when is the first time a person can see a point we will say fifty feet up the track after you pass the station? How close would you be then to the railroad track? A. About a span and a half.

"Q. You say a span and a half, what are you referring to? A. Well, those black streaks that run across the highway.

"Q. On this particular night did you see the collision between the auto and the train? A. Yes, I did.

"Q. Where were you at the time of the collision? A. Standing in front of the station.

"Q. Did the train or any person on that train blow a whistle or ring a bell at any time within a distance of five hundred yards or more from that cross roads? A. No, they did not.

"Q. What is the condition of your hearing? A. It is good.

"Q. If it had blown the whistle or rung the bell would you have heard it? A. Yes.

"Q. Was there anything going on around there that would have prevented you from hearing it if it had blown the whistle or rung the bell? A. No, sir.

"Q. Now will you tell us, do you drive an automobile? A. Yes.

"Q. About how long have you been driving? A. About fifteen years.

"Q. Do you know generally about the speed of autos? A. Well, I guess I do.

"Q. Can you tell us in your opinion how fast Mr. Carter was traveling when you were in front of the station? A. Yes.

"Q. Will you tell us about how fast he was driving? When he passed in front of you? A. He was driving about twenty-five miles an hour, when he passed me.

"Q. Did you see the train before it hit him? A. Yes.

"Q. Will you tell us how fast in your opinion that train was being operate at the time of the collision? A. That train was driving about thirty-five miles an hour.

"Q. Now, Mrs. Odom, I believe they have what they call blinker lights at that cross roads? A. Yes.

"Q. This station, your station is directly across from the chair factory? A. Yes.

"Q. And that is just before you get to the crossing going in the direction that car was going? A. Yes.

"Q. Now were those lights operating at the time of the collision or any time immediately prior thereto? A. No, sir.

"Q. Do you know that of your own knowledge? A. Yes.

"Q. Have you in the past or how long did you live in Society Hill? A. Twenty-three months.

"Q. And did you stay at the same place all of that time? A. Yes, the same place right there.

"Q. Will you tell whether or not you have had occasion from time to time to see trains cross that crossing coming across on the track that this train was coming on? A. Yes, sir.

"Q. What or when does that light start operating when a train on that particular track approaches the highway from the direction that this train was coming that night? A. Well, it is almost to the brickyard, when it is almost on the highway.

"Q. I believe there is a brickyard beyond the track? A. Yes.

"Q. Will you tell which track it was that the train was on? A. It was on the spur track coming from the brickyard. It had been to the brickyard and was coming out.

"Q. Do you know generally how that track is shaped, how it looks? A. Well, it just comes in a curve all of the way around.

"Q. Now Mrs. Odom, will you tell us if there is any road between your station and the railroad track? A. Yes, sir.

"Q. Where does that road lead to? A. It goes to the Atlantic Coast Line Depot.

"Q. Did you know Mr. Carter any time prior to that? A. No, sir, I had seen him pass there but I did not know him.

"Q. About what time of day was that? A. Between 6:30 and a quarter to 7, somewhere around that time.

"Q. Can you tell us whether or not Mr. Carter looked and listened before he crossed that crossing? A. Yes, sir.

"Q. When you say he did, what did you observe if anything about him? A. Yes.

"Q. How could you tell? A. Because he looked down next to the depot and then he looked over towards the chair factory.

"Q. Was he slowing up or speeding? A. He was slowing up all of the time. ·

"Q. And you say he was traveling about 20 or 25 miles an hour? A. Yes.

"Q. Was there anybody else standing there with you? A. There was just a small colored boy, a little colored boy."

Mr. L. C. Haselden, another witness for the plaintiff, testified that he lives about four or five hundred yards from this crossing and is familiar with its surroundings. At the time of the crash he was in the railway station near by. That at the time he was and had for a number of years been employed as section foreman by the defendant railway company in this territory. That the pass track runs parallel to the main line and is approximately thirteen feet distant. That he reached the scene of the collision in a short time and the signal lights were operating at that time, but such signals do not begin operating when the train is on the pass track until the engine is within approximately three feet of the highway. At the time of the collision he was coming out of the railway station and heard neither the whistle nor the bell although on numerous occasions previously he had heard both the whistle and bell plainly from this position. That a part of the warning system where the blinker lights were attached consisted of a panel with the word STOP on it which, when not in use, faced the railway traffic and was at right angles to vehicular traffic along the highway. Upon the passage of a train sufficiently far beyond the point where the bond wires are attached to the rails to·form a ground, the lights begin flickering and the panel with the word STOP automatically turns to face on-coming highway traffic. He also testified that the deceased was unable to see down the railway tracks until he had reached a point approximately twenty or twenty-five feet therefrom, because of the filling

station and other obstructions. He further testified, that by reason of his long association with the railroad, it was his custom upon seeing or hearing a train, to notice whether or not the whistle was blowing or the bell ringing. A portion of his testimony appears as follows:

"Q. When a train is on the pass track going into the same direction or other direction, when, then, do the blinker lights get on? A. Well, the blinker lights come on when the train is within three feet of the edge of the hard surface.

"Q. That would be, you mean from about three feet from the pavement? A. Yes.

"Q. And about three feet from the crossing? A. Yes.

"Q. What causes the difference? A. Well, there is what they call a bond wire the signal man puts on there, it is insulated, and where it is bonded it is only bonded for that short distance on the pass line, the bond is on the rail only about three feet away from the hard surface and at an angle, the highway runs at an angle, it is some distance.

"Q. When you say the bond, that is a mechanical device that causes the blinker to go on? A. Yes; that is the wire in the joint.

"Q. And you say that is about thirty-three feet from the crossing? A. Yes.

"Q. Does the blinker light go on as soon as the engine hits the bond? A. No.

"Q. What causes that, what causes the blinker to go on? A. Well, it is after the train gets on it well enough to ground it out.

"Q. In other words when the train first passes over what you call the bond, that don't trip the signal immediately? A. No.

"Q. The first wheels? A. No, that is right.

"Q. And it does not trip the signal so that the blinkers go on until the train passes far enough over that bond to get the front of the engine about three feet from the crossing? A. Yes; that is right."

Dr. P. M. Kinney who attended plaintiff's intestate upon his arrival at the hospital in Bennettsville, S. C., testified that Mr. Carter died as a result of his injuries, but before doing so told him that he saw the train and the light, signal light, at the same time but it was too late for him to do anything about it.

As happens so often in cases of this sort, some of the testimony is hopelessly in conflict as for example; there is some testimony estimating the speed of the engine approaching this crossing at thirty-five miles per hour, while the engineer testified that the engine was not moving more than two or three miles per hour and had come to a complete halt at the time of the crash. That the bell and whistle both were being sounded continuously and that although the headlight could be dimmed, such was not the case at the time, yet there is other testimony to the effect that neither the bell nor the whistle was sounded and that the headlight was on dim instead of bright. He further testified that his run consisted of that area between Wadesboro, N. C., and Florence, S. C., and on this occasion was running approximately four hours late. That he was bringing a loaded car of brick from the brickyard and in order to clear the switch so as to get back on the main line to the rest of the train it was necessary to cross highway 15-A. That the distance from the switch point to the highway is forty feet, while the engine and tender are seventy-five feet in length, but approximately thirty feet of the engine must pass over contact point before warning lights go on. At the time he passed the switch point he saw the brakeman alight from the rear of the tender with his lantern, but that he did not see the approaching car until the front of the engine was practically upon the highway, and at that time the oncoming car was approximately 150 feet to 200 feet from the crossing, but continued until it struck the pilot step at the front end of the cylinder after he had stopped. A plat which was introduced into the record by the defendant shows that the filling station is located

approximately thirty-two feet ,from the highway and approximately eighty-three feet from the pass track. Mr. T. E. Wilson, a civil engineer, testified that 136 feet from the track along the road in the direction from which Mr. Carter approached one could see 336 feet down the pass track and, of course, one 336 feet down the pass track could see 136 feet up the highway.

The testimony of other witnesses varies in many respects but all agree that when a train is operating along the pass track, as here, the signal lights would not begin flashing and the stop disk begin to face highway traffic until the front of the engine had reached a point at or within a few feet of the highway.

Mr. T. A. Mitchell testified that he is supervisor of signals for the Atlantic Coast Line and that the contact point is not less than twenty feet and not more than thirty feet from the highway. That on the main lines the contact points are set back as far as 2,800 feet, the distance depending upon the speed of the trains operating on that track. The contact points being set so that the warning signals will be in operation approximately twenty seconds before the train reaches the crossing. This witness and his assistant both testified upon cross-examination that there was no reason why the contact points could not be set further back and the highway traffic given more warning.

"It was held in *Ford v. Atlantic Coast Line R. Co., supra,* 169 S. C. 41, 168 S. E. [143], 156, that if the facts 'in controversy and the inferences properly deducible therefrom are doubtful, or if they tend to show both parties guilty of negligence or willfullness and there may be a fair difference of opinion as to whose act produced the injury complained of as a direct and proximate cause, then the question becomes issuable and must be submitted to the jury under appropriate instructions.'

"And it was said in *Carter v. Atlantic Coast Line R. Co., supra,* 192 S. C. 441, 7 S. E. (2d) [163], 168, quoting from

52 C. J. 496, 497, 'It is ordinarily a question for the jury whether under the particular circumstances one who was injured at a railroad crossing at which his view or hearing was obstructed exercised due care in looking and listening, or in stopping, looking and listening, for approaching trains, cars or engines at a proper time and place and in the right direction. * * *' *Barber v. Richmond & D. R. Co.,* 34 S. C. 444, 13 S. E. 630; *Drawdy v. Atlantic Coast Line R. Co.,* 78 S. C. 374, 58 S. E. 980; and *Griskell v. Southern R. Co.,* 81 S. C. 193, 62 S. E. 205."

In *Carter v. Atlantic Coast Line R. Co.,* 194 S. C. 494, 10 S. E. (2d) 17, 20, this court said, "A rule established by the foregoing cases is that a traveler on reaching a railroad crossing and before attempting to go upon the track, must use his senses of sight and hearing to the best of his ability under the existing and surrounding circumstances; he must look and listen in both directions for approaching trains; if not prevented from so doing by the fault of the railroad company, and to the extent the matter is under his control, he must look and listen at a place and in a manner that will make the use of his senses effective. Another principle which the cases sustain is that the duty of a traveler arising under the foregoing rule is not an absolute one, but may be qualified by attendant circumstances." *Taylor v. Powell,* 195 S. C. 486, 12 S. E. (2d) 27.

" 'Even though the view of the railroad track be partially obstructed at a crossing, that fact does not relieve the traveler of the obligation to look and listen for an approaching train. The very fact of the existence of such obstruction, and particularly when it is known to the traveler, imposes additional care and caution upon him when approaching the track. The right of a railroad company at a highway crossing is superior to the right of a traveler upon a highway, but this superior right does not relieve the company of reasonable and ordinary caution to prevent accidents at such crossing, and this degree of care may be affected by obstructions

which prevent the track from being seen as a train approaches. Both the traveler and the company are charged with the same degree of care; the one to avoid being injured, and the other to avoid inflicting injury. The care of each must be commensurate with the risk and danger involved. The greater the risk, the greater the care. *Chisolm v. Seaboard Air Line Ry. Co., supra* [121 S. C. 394, 114 S. E. 500]; *Edwards v. Southern Railway,* 63 S. E. 271, 288, 41 S. E. 458; *Johnson v. Seaboard Air Line R. Co.,* 163 N. C. 431, 79 S. E. 690, Ann. Cas. 1915B, 598; *Southern R. Co. v. Hansbrough's Adm'x,* 107 Va. 733, 60 S. E. 58.' *Robison v. Atlantic Coast Line R. Co., supra* [179 S. C. 493, 184 S. E. 96]." *Arnold v. Charleston & Western Carolina R. Co.,* 213 S. C. 413, 49 S. E. (2d) 725, 731.

The question of whether or not respondent's intestate was guilty of contributory negligence was also a matter to be determined by the jury. He was an employee of the defendant railway company and having traveled this road was aware that the signals were there and therefore probably relied upon their giving adequate warning more than the average traveler along this highway and the degree of care which he was bound to exercise was a question for the jury. A full discussion of this will be found in the very recent case of *Cammer v. Atlantic Coast Line R. Co.,* 214 S. C. 71, 51 S. E. (2d) 174, 177, which states in part:

"Appellants question in argument the availability to respondent of the fact averred in the evidence by her and by numerous of her witnesses that the warning, flashing lights were not operating when the automobile entered the crossing and until the collision occurred. Reference, however, to the complaint discloses allegation thereof in two paragraphs where it is said that, quoting, 'the flashing lights stopped blinking.' The fact is important whether it is alleged to prove negligence of the company or, as here, is relevant upon the question of contributory negligence or contributory willfullness. Similar, if not identical, warning lights were installed

at the crossing involved in *Bishop v. Atlantic Coast Line R. Co.*, 213 S. C. 125, 48 S. E. (2d) 620, where the effect of like testimony was not decided for the reason that there was no allegation in the complaint in that action that the signals were out of order or operating improperly. The substance of the contention there was, and here is, that the fact-finding body may properly decide that a motorist may rely upon such warning signals and when they are present but not operating may take it as an assurance of safe entry upon the crossing. .

"Automatic warning lights and similar devices at crossings may not be soundly said to relieve one of all care save obedience to their signal. The test is, as usual, the conduct of the average, reasonably prudent person, under the existing conditions. But put there to warn of danger, when the warning ceases a resulting assumption of safety reasonably arises. This will hardly escape the jury, and should not. The circumstance is properly an element of the applicable standard of due care. This was the rule applied in the instruction to the jury, unexcepted to, in our case of *Ballard v. Southern R. Co.*, 197 S. C. 288, 15 S. E. (2d) 342, where the law of North Carolina was controlling. It is approved by the authorities generally. The following quotation is from 44 Am. Jur. 817, Railroads, Sec. 563, and in the footnotes are found citations of several annotations to which reference may be had :

" 'In perhaps a longer line of decisions it is held that while the failure of a signaling device at a railroad crossing to operate and warn of the approach of a train does not entirely relieve a traveler from his duty to look and listen for an approaching train, nevertheless the traveler may rely to some extent on the apparent safety implied from the silence of the signal, and such silence of the signal is a circumstance to be taken into consideration by the jury on the issue of contributory negligence. The failure to give the signals raises the presumption of safety, but such failure is no more than

a circumstance which may properly be taken into consideration in determining the ultimate question of whether he did exercise the degree of care required or not. And, in determining whether he did exercise such care, his conduct at the time is to be judged in the light of such presumption.' "

We are of the opinion that the defendant's motions for a nonsuit, directed verdict, and judgment for the defendants *non obstante veredicto,* or for a new trial in the alternative were properly denied. We are satisfied the evidence is such as to require its submission to the jury. See *Langston v. Atlantic Coast Line R. Co., supra; Mills v. Atlantic Coast Line R. Co.,* 85 S. C. 463, 67 S. E. 565; *Norwood v. Atlantic Coast Line R. Co.,* 203 S. C. 456, 27 S. E. (2d) 803; *Harrison v. Atlantic Coast Line R. Co.,* 196 S. C. 259, 13 S. E. (2d) 137; *Cook v. Atlantic Coast Line R. Co.,* 196 S. C. 230, 13 S. E. (2d) 1, 133 A. L. R., 1144; *Carter v. Atlantic Coast Line R. Co.,* 194 S. C. 494, 10 S. E. (2d) 17; *Smith v. Southern R. Co.,* 207 S. C. 179, 35 S. E. (2d) 225; *Haselden v. Atlantic Coast Line R. Co.,* 214 S. C. 410, 53 S. E. (2d) 60, and many other cases cited in these decisions.

The next question to be considered is whether or not the trial judge committed error in refusing appellants' motions for a nonsuit and directed verdict upon the ground that plaintiff is without capacity to maintain this action. The estate of Luther W. Carter, deceased, had been settled, with the exception of this claim against the defendants, and the widow then living in another state petitioned the Probate Court to appoint the present Administratrix, G. B. Jennings, which was promptly done, and the appellants now contend, improperly for various reasons. The complaint alleges that G. B. Jennings is the duly appointed, qualified and acting Administratrix of the estate of Luther W. Carter, deceased. Paragraph one of the answer sets forth as to the above allegation, that the defendants deny that they have any knowledge or information thereof sufficient

to form a belief, and then specifically deny the remaining allegations of this same paragraph of the complaint. The question to be dismissed here is whether or not the allegation that defendant lacks sufficient knowledge to form a belief or a general denial, is sufficient to raise the issue of plaintiff's right to sue in a representative capacity. In *Liberian Exodus Joint Stock Steamship Co. v. Rodgers,* 21 S. C. 27, the complaint alleged that the plaintiff was a body corporate of the State of South Carolina, to which allegation the defendant answered as follows:

" 'That he has no knowledge or information sufficient to form a belief as to the truth of the allegation contained in the first paragraph of the complaint.' " Upon trial of the cause the defendant moved for a nonsuit based on the incapacity of plaintiff to sue, because the charter granted plaintiff by the clerk was utterly without authority and void. In disposing of this contention on appeal, the Court stated:

"It seems to us that the pleadings   *   *   *   did not put in issue the existence or legality of the plaintiff's corporation; that the defendant having put in only a general denial thereby waived the right to assail the charter of incorporation, and it was unnecessary for the plaintiffs to have put it in evidence and it may be regarded as not in the case.

"We think legislation has been adopted in this state * * * requiring a defendant, when sued by a corporation, and desiring to question its right so to sue, to give the plaintiff notice of such intention in advance, either by demurrer, plea in abatement, or special answer. Where the objection is that the plaintiff has not legal capacity to sue, our code   *   *   * requires such objection to be made in a particular manner. *   *   *   If it (the alleged want of legal capacity to sue) does not appear upon the face of the complaint then it is incumbent on him to take the objection by answer; and if such special objection is not taken, either by demurrer or answer, the defendant shall be deemed to have waived the

same. Code Sections.168 and 169. (Now sections 461 and 462.)

"The only answer made to this part of the complaint was 'that he has no knowledge or information sufficient to form a belief as to the truth of the allegation contained in the first paragraph of the complaint'. This was only one of the modes of making a general denial under Section 170 (now Section 467) of the Code, which declares that 'the answer of the defendant must contain a general or special denial of each material allegation of the complaint contested by the defendant, or of any knowledge or information sufficient to form a belief', etc. Did this general denial put in issue, in the manner required, not only the general merits of ·the case, but also the legal capacity of the plaintiff to sue as a body corporate? As we understand it, the authorities both of New York and of this state hold that it did not.

"It may be true that a general denial under the code, like the general issue under the old practice, as a rule throws upon the plaintiff the onus of proving all the material allegations of his complaint; but it seems that for special reasons the code makes an exception as to those matters which are set down in Section 165 (now Section 458 of the Code) as causes of demurrer, and of them the second is 'that the plaintiff has not legal capacity to sue'. As to the matters so set down in the section indicated, the objection must be specifically taken either by demurrer or answer; and if not so taken, 'the defendant shall be deemed to have waived the same, excepting only the objection to the jurisdiction of the court, and the objection that the complaint does not state facts sufficient to constitute a cause of action.' Under a general denial the defendant cannot insist that the plaintiff has not legal capacity to sue, when the fact does not appear upon the face of the complaint. Citing authorities including *Commercial Insurance & Banking Co. v. Turner,* 8 S. C. [107], 110."

In the case of *Blackwell v. British-American Mortgage Co.,* 65 S. C. 105, 43 S. E. 395, defendant was not allowed to avail itself of the defense that Susie Blackwell did not have capacity to sue though she had been adjudged insane and a committee had been appointed, by reason of the fact that defendant had plead only a general denial, see also *Kirton v. Howard,* 137 S. C. 11, 134 S. E. 859.

Appellants contend that such authority is not controlling here in that the records of the appointment in the Probate Judge's Office were introduced into evidence and made a part of the record of this case and that such Probate records show that following the resignation of Mrs. L. W. Carter as Administratrix and the filing of her petition with the Probate Court that G. B. Jennings be appointed to succeed her, the Judge of Probate complied immediately without issuance or publication of citation and appointed the present administratrix c. t. a., d. b. n., by order bearing the same date as Mrs. Carter's petition. With this contention we are unable to agree as we are of the opinion that under the pleadings heretofore referred to, appellant is not in a position to attack collaterally paintiff's appointment and thereby avail themselves of the defense that plaintiff is without capacity to sue.

In *Martin et al. v. Fowler,* 51 S. C. 164, 28 S. E. 312, 314, the court denying a motion for a new trial on the ground that plaintiffs were not the duly appointed administrators of the deceased said: "As far back as the case of *Reynold's Ex'rs v. Torrance,* 2 Brev. 59, it was held that, if the defendant desires to raise the issue of plaintiff's right to sue in a representative capacity, he must do so by his pleading, and, if he omits to do so, he is estopped from afterwards raising such issue. Brevard, J., in delivering the opinion of the court, uses this significant language, which is so pertinent to our present inquiry that we quote it: 'But if the defendant omits to plead that the plaintiff never was executor, and pleads over to the action, he admits the right of the

plaintiff to sue in the character he assumes, and is afterwards estopped to deny that he is executor.'"

Appellants next raise the question of whether or not the trial judge committed error in refusing defendant's motion to set aside the verdict of the jury in its entirety or refusing to grant a new trial *nisi* on the ground that the verdict was so excessive and unjust that it could have only been the result of caprice, passion, prejudice or other considerations not found in the evidence.

This court said in the very recent case of *Bowers v. Charleston & W. C. Ry. Co.,* 210 S. C. 367, 42 S. E. (2d) 705, 708:

"The power and duty of the Supreme Court to reverse a judgment entered upon a jury verdict where the record clearly discloses that the amount of the verdict is unconscionably high, and has no relation to any reasonable measure of damages for the injury inflicted, has been rarely exercised, but nonetheless exists and when, as in this case, the exercise of the power is invoked, it is the duty of the Court to examine the record in the light above stated.

"This power is analogous to that of a trial judge, to the extent that in either Court a judgment based on a verdict of the character above indicated will be set aside by the granting of a new trial. The difference between the powers of the two Courts is that in the case of the Circuit Court, the error of the jury in rendering an unreasonable verdict can be cured either by granting a new trial absolute, or by granting a new trial *nisi,* whereas in the case of the Supreme Court there is no power to grant a new trial *nisi.* The relief that can be afforded here is the granting or the refusal of a new trial."

The verdict in this case is unquestionably large but this alone is insufficient for this court to set it aside on the grounds of excessiveness, if there is testimony upon which the jury could have based its verdict. In deter-

mining the amount of the award in this case the jury was warranted in considering the elements of pecuniary loss, mental shock and suffering, wounded feelings, grief and sorrow, loss of companionship, and deprivation of the use and comfort of intestate's society, the loss of his experience, knowledge and judgment in managing the affairs of himself and of his beneficiaries. *Mishoe v. Atlantic Coast Line R. Co.*, 186 S. C. 402, 197 S. E. 97.

Deceased at the time of his death had been an employee of the defendant railway company for thirty-seven years, was fifty-six years of age with a life expectancy of 16.2 years, earning $2,475.00 per year. He was in good health and is survived by his widow and two children of the ages of fourteen and twenty years. The evidence shows that he was their sole support and a devoted husband and father.

The cause was tried in Darlington County while the deceased resided in Marlboro County and resulted in a verdict of $70,000.00 actual damages and $15,000.00 punitive damages. The relative small amount of punitive damages would tend to negative any idea of passion or prejudice. The record is free of any incidents or circumstances showing that either party attempted to appeal to the passion or prejudice of the jury. This same question was gone into rather thoroughly in the case of *Haselden v. Atlantic Coast Line R. Co.*, 1949, 214 S. C. 410, 53 S. E. (2d) 60, 67, and this court said therein: "In personal injury actions the courts have for a long time, in passing upon objections of excessiveness * * * of the damages allowed and in comparing present and past verdicts for similar injuries, given consideration to the increased cost of living and the impaired purchasing power of money. * * * As has been said, compensation means compensation in value. It will not do to say that the same amount of money affords the same compensation when money is cheap as when money is dear. The value of money lies not in what it is, but in what it will buy. A sum

of money that was fair compensation in value for given injuries when money was dear and its purchasing power was great will suffice when money is cheap and its purchasing power is small. Increased cost of living or diminished purchasing power of money not only has been recognized as a proper matter for consideration of the court in passing upon a verdict attacked as excessive or inadequate, but has also been held to be a proper matter for the consideration of the jury in reaching a verdict in the first instance." 15 Am. Jur., Sec. 204, P. 621.

This court has consistently refused to set aside verdicts on the grounds of excessiveness unless there is a showing that such is the result of caprice, passion, prejudice, or other consideration outside the evidence. In *Miller v. Atlantic Coast Line R. Co.,* 140 S. C. 123, 138 S. E. 675, this court in its opinion dated September 10, 1926, refused to reverse a verdict for $50,000.00 and the purchasing power of the dollar is considerably less now than it was at that time, see also *Huggins v. Atlantic Coast Line R. Co.,* 96 S. C. 267, 79 S. E. 406, and *Brickman v. Southern R.,* 74 S. C. 306, 54 S. E. 553.

It is well settled that this court, confined by constitutional limitations to the correction of errors of law in cases of this character, has no power to review and reverse the ruling of the circuit judge refusing to grant a new trial upon the ground that the verdict was excessive, unless the appeal record discloses and warrants the conclusion, as a matter of law, that such refusal amounts to a manifest abuse of the discretionary power exclusively vested in him to grant a new trial on account of matters of fact. See *Duncan v. Record Publishing Co. et al.,* 145 S. C. 196, 143 S. E. 31; *Union Bleaching & Finishing Co. v. Barker Fuel Co.,* 124· S. C. 458, 117 S. E. 735; *Bennett v. Southern Ry. Co.,* 98 S. C. 42, 79 S. E. 710, *Southern Ry.-Carolina Division v. Bennett,* 233 U. S. 80, 34 S. Ct. 566, 567, 58 L. Ed. 860; *Payne v. Cohen,* 168 S. C. 459, 167 S. E. 665,

667; *Williams v. Tolbert,* 76 S. C. 211, 56 S. E. 908; *Steele v. Atlantic Coast Line R. Co.,* 103 S. C. 102, 87 S. E. 639.

Considering the wages of respondent's intestate in the light of his life expectancy one might arrive at a reasonably accurate estimate of the loss of earnings but there is no such mathematical formula by which one might be compensated for mental shock and suffering, wounded feelings, grief and sorrow, loss of companionship, and deprivation of the use and comfort of one's judgment in managing the affairs of himself and his beneficiaries, *Mishoe v. Atlantic Coast Line R. Co., supra.* This duty is wisely placed within the province of the jury who in this case has fixed the value of such loss at $70,000.00, and having done so this court is unwilling to substitute its judgment for that of the jury and place a value of its own thereon, saying in effect that such value is unconscionably high and has no relation to any reasonable measure of damages for the injury inflicted but was arrived at as a result of caprice, passion, prejudice or other consideration outside the evidence..

Testimony was adduced to the effect that the front of the engine approaching the highway along this spur track would be at or very near the highway before the traffic signal lights would begin operating and the stop sign begin revolving to face the on-coming traffic. The engineer admitting that it would be necessary for the engine to proceed approximately thirty feet beyond the contact point before the ground would be completed and the traffic lights begin flashing. The supervisor of signals for the defendant railway company testified that the contact points on this spur track were set back from twenty to thirty feet from the highway. There is testimony also that the engine in this instance was being operated at what may be termed by the jury as an excessive rate of speed under the circumstances, that neither the whistle nor the bell was sounded and that the headlight was on dim, being an orange color, rather than bright, which if seen by one coming from the direc-

tion in which plaintiff's intestate was traveling would have a tendency to be confused with the lights on the pumps at the front of the filling station, his view being obstructed until he was practically in front of the station. This in our opinion is sufficient to require the trial judge to submit to the jury the question of punitive damages under the authority of *Ford v. Atlantic Coast Line R. Co.*, 169 S. C. 41, 168 S. E. 143, and *Bell v. Atlantic Coast Line R. Co.*, 202 S. C. 160, 24 S. E. (2d) 177.

The next question posed by appellants is whether or not the trial judge committed error in refusing appellants' motions for a judgment *non obstante veredicto* or for a new trial in the alternative in that he thereby adjudicated vital issues of fact. There is no merit in this contention, see *Rountree v. Atlantic Coast Line R. Co.*, 73 S. C. 268, 53 S. E. 424; *Webber v. Ahrens*, 36 S. C. 585, 15 S. E. 732; *Sloan v. Pelzer*, 54 S. C. 314, 32 S. E. 431, and *Haselden v. Atlantic Coast Line R. Co.*, *supra*.

For the foregoing reasons this court is of the opinion that all exceptions should be dismissed and the judgment of the trial court affirmed and it is so ordered.

Judgment affirmed.

STUKES and OXNER, JJ., concur.

BAKER, C. J., and FISHBURNE, J., concur in part and dissent in part.

FISHBURNE, Justice (concurring in part and dissenting in part).

I agree with the decision of the issues raised by appellants' exceptions, except the one relating to the excessiveness of the verdict. On this feature of the case I must dissent.

A fair and adequate statement of the facts is narrated in the opinion of Mr. Justice Taylor; hence it is unnecessary to re-state the circumstances giving rise to this action or the damages suffered.

I fully realize that it is the duty of the jury in the first instance, and not of the appellate court, to fix the amount of the damages, and that their verdict in an action for unliquidated damages should not be set aside merely because it is large, or because the reviewing court would have awarded less. It is generally recognized that full compensation is impossible in the abstract, yet there must be some limit to the amount to be allowed, and it is the plain duty of the appellate court to see that just limits are not grossly exceeded. In this case, no monetary consideration can fully compensate the surviving wife and children for the loss suffered by them in the violent death of the deceased, and for the loss of his affectionate care and attention. A just amount by way of compensation for the injury should be ascertained by the jury, unaffected by passion, prejudice or partiality. The size of the verdict alone may be so disproportionate as to show that it must have been the result of partiality, prejudice, or other considerations not founded on the evidence. And in my opinion, it is reasonable to conclude that the damages awarded in this case are so excessive as to warrant the reasonable inference that the jury disregarded the evidence.

For this court to exercise a supervisory power over the amount of jury verdicts in cases involving unliquidated damages which are clearly excessive is not in derogation of the right of trial by jury. This principle was very soundly stated in the recent case of *Bowers v. Charleston & W. C. R. Co.,* 210 S. C. 367, 42 S. E. (2d) 705, 708, where it was said:

"The power and duty of the Supreme Court to reverse a judgment entered upon a jury verdict where the record clearly discloses that the amount of the verdict is unconscionably high, and has no relation to any reasonable measure of damages for the injury inflicted, has been rarely exercised, but nonetheless exists and when, as in this case, the exercise

of the power is invoked, it is the duty of the Court to examine the record in the light above stated.

"This power is analogous to that of a trial judge, to the extent that in either Court a judgment based on a verdict of the character above indicated will be set aside by the granting of a new trial. The difference between the powers of the two Courts is that in the case of the Circuit Court, the error of the jury in rendering an unreasonable verdict can be cured either by granting a new trial absolute, or by granted a new trial *nisi*, whereas, in the case of the Supreme Court there is no power to grant a new trial *nisi*. The relief that can be afforded here is the granting or the refusal of a new trial."

To the same effect see *Norwood v. Atlantic Coast Line R. Co.*, 203 S. C. 456, 27 S. E. (2d) 803; *Smith v. Southern Ry. Co., Carolina Div.*, 207 S. C. 179, 35 S. E. (2d) 225; *Hyde w. Southern Grocery Stores*, 197 S. C. 263, 15 S. E. (2d) 353; *Poole v. Saxon Mills*, 192 S. C. 339, 6 S. E. (2d) 761.

The evidence in this case shows that the deceased was fifty-six years of age at the time of his death; was earning $206.26 per month as a bridge-foreman of the appellant railroad company, and had a life expectancy of 16.02 years; was in sound health, and provided well for his family, consisting of his wife and two sons aged 14 and 20 years respectively. On the basis of his monthly earnings, his annual compensation amounted to $2,475.12. Assuming that the deceased would have lived to the end of his life expectancy of 16.02 years, and that his earnings would not have diminished because of his advancing years, loss of time or other cause, he would have earned in salary during the remainder of his life the sum of $39,651.42.

I realize that there is no mathematical formula by which it may be determined whether a verdict is excessive, or to what extent it is excessive. Each case depends upon its own

facts, giving some consideration to economic conditions and the compensation awarded and permitted in similar cases. I am likewise aware of the difficulties inherent in an appellate court's passing upon the excessiveness of verdicts. But viewing the case most favorably to the plaintiff, recognizing that the amount of damages is primarily the prerogative of the jury, and weighing the fact that the trial court considered the excessiveness of the verdict, I cannot escape the conclusion that the verdict for $70,000.00 actual damages is manifestly excessive and should not stand.

The verdict rendered in this case far exceeds in amount any award heretofore rendered by any jury in this state. It will be of interest to note many similar cases and the amount of verdicts therein given as listed in appellants' brief. I cite a few of them:

$35,000 for death of 49 year old husband and father of five children, earning $3,000.00 to $4,000.00 annually. *Norwood v. Atlantic Coast Line R. Co.*, 1943, 203 S. C. 456, 27 S. E. (2d) 803.

$40,000.00, reduced by trial court to $24,000.00, for death of 51 year old produce man survived by widow and minor son. *Mishoe v. Atlantic Coast Line R. Co.*, 1938, 186 S. C. 402, 197 S. E. 97.

$50,000.00 for death in crossing accident of a young man of high character with excellent prospects for the future. *Miller v. Atlantic Coast Line R. Co.*, 1926, 140 S. C. 123, 138 S. E. 675.

$10,000.00 actual damages and $15,000.00 punitive damages for death of man 62 years old hit by train, survived by widow. *Carter v. Seaboard Air Line R. Co.*, 1920, 114 S. C. 517, 104 S. E. 186.

$20,000.00 actual damages for death by electricity of man survived by widow and child. *Lundy v. Southern Bell Telephone & Telegraph Co.*, 1911, 90 S. C. 25, 72 S. E. 558.

$55,000.00 actual damages reduced to $40,000.00 by trial court for death of 40 year old engineer, earning $140.00 to $170.00 monthly, life expectancy of 28 years,—in accident resulting from defective trestle. *Brickman v. Southern R. Co.*, 1906, 74 S. C. 306, 54 S. E. 553.

For the foregoing reasons, I dissent. In my opinion, the case should be remanded for a new trial.

BAKER C. J., concurs.

ORDER ON SUPPLEMENTAL PETITION FOR RE-REHEARING

PER CURIAM.

In the supplemental petition for a rehearing appellants contend that this court misapprehended or overlooked the evidence and the law pertinent to this case on the question of punitive damages. This court disposed of this question in its opinion 55 S. E. (2d) 532. A further consideration of this question shows that there was ample evidence to require the trial judge to submit the question of punitive damages to the jury. There was evidence from which the jury would be warranted in concluding that appellant's train was being operated in violation of the statute requiring the giving of proper signals and at an excessive rate of speed.

Mr. T. A. Mitchell, supervisor of signals for defendant railway company, testified that the contact point was not less than twenty feet nor more than thirty feet from the highway. Mr. Mims, the engineer of the train involved, testified that approximately thirty feet of the engine must pass the contact point before the signals begin operating, therefore, according to the testimony of defendant's own witnesses the jury would have been justified in concluding that defendants knew or should have known that the engine would be at or upon the highway before the warning signals would begin operating.

This and other evidence referred to in the opinion is ample to require the trial judge to submit the question of punitive damages to the jury for their consideration.

The petition is denied.