Nancy C. **BROOKS**, as Executrix of the Estate of Ronnie Jayhue Brooks, Deceased, Plaintiff,

v.

The **UNITED STATES** of America, Defendant.

Civ. A. No. 66–514.

United States District Court
D. South Carolina,
Columbia Division.

Sept. 15, 1967.

William H. Gibbes (Berry & Gibbes), Columbia, S. C., for plaintiff.

Terrell L. Glenn, U. S. Atty., Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND OPINION

DONALD RUSSELL, District Judge.

In this action to recover damages both for wrongful death (Section 10–1951 et seq., Code of South Carolina, 1962) and for pain and suffering (Section 10–209, Code of South Carolina, 1962), filed under the Federal Tort Claims Act, the defendant has conceded that the injuries sustained by the decedent, resulting in the latter's death, were due to the negligence of the defendant's authorized agent. The only issues presented involve the right of the plaintiff to recover for decedent's pain and suffering and the quantum of damages for wrongful death.

In connection with such issues, I make the following findings of fact and conclusions of law:

At the time of his fatal accident, April 20, 1966, the decedent was thirty-three years old, was happily married and the loving father of three children, twins age 10 and the third 5 years of age.

For some ten years prior to his death, he had been employed by the National Cash Register Company, from 1956 as an office clerk and then as service apprentice, since 1960 as a technical service representative, working out of the Columbia, South Carolina branch. As such technical service representative, he serviced the machines sold by that company in the area about Columbia. He was a skilled repairman, with a pleasing personality, well regarded both by his supervisors and his fellow-workers. With commendable interest in his work, he had cultivated and improved his competency

and qualifications as a technical repairman. His employer recognized both his improving competency and his devotion to his work. It had taken steps to improve his qualifications by in-service training at its main plant. Actually, at the time of his death, he had been selected for additional in-service training at the headquarters of his employer.

His supervisors in the Columbia branch and his fellow employees expressed the opinion that, based on his qualifications and interest in his work, the decedent should have expected advancement with the Company. The range of possible promotion was outlined in the record. While these follow employees were acquainted with the decedent's qualifications, they, of course, had little or no knowledge or acquaintanceship with the qualifications of others similarly employed in the score of other branches, some larger and some smaller than the Columbia branch, operated by the employer. Moreover, the decedent had been in his classification at the time of his death for some six years, without any promotion or advance in pay, save as there were general wage increases given by the Company. In such classification, he, along with the other employees had received several pay increases in the two years preceding his death. This was in keeping with recent policy of the Company, which, while having no fixed periods of wage adjustments, had followed the custom for the last few years before decedent's accident of giving irregular wage increases. Between April 20, 1966, the date of death of the intestate, and December 21, 1966, for instance, wage increases of 8 per cent were given. These wage increases were paced generally by increases in the cost of living and by inflationary pressures generally.

Over the period of the last five years prior to his death, the yearly earnings of the decedent were:

| | Total Earnings | Regular Time | Overtime |
| --- | --- | --- | --- |
| 1961– | $6,360.46 | $5,842.94 | $517.52 |
| 1962– | $6,751.85 | $6,295.58 | $456.27 |
| 1963– | $7,010.46 | $6,534.72 | $475.74 |
| 1964– | $8,108.53 | $7,348.20 | $760.33 |
| 1965– | $7,828.93 | $7,465.41 | $363.52 |

The overtime pay, it will be noted, fluctuated over these years, representing changes in demand for the Company's product and accordingly for service thereon. Thus, in 1961, overtime represented over 8 per cent of the decedent's annual earnings. On the other hand, in 1965, overtime accounted for about 4½ per cent of such earnings.

Under the employment policy of the National Cash Register Company, non-management employees normally retired at age 68. Upon retirement at such age, he became entitled to pension rights. Such rights of the deceased, if he had remained until 69 in the employment of the Company, by agreement would have been $8,596.90, annually, *prior* to deduction of income taxes, personal deductions, etc., or discount to present value.

■ Certain expert testimony was offered on the rate of erosion of "purchasing power of money", on recent rates of increases in wages in the United States, and calculations of present value of various assumed earning bases. Such testimony was based on statistical material taken from official governmental reports, of which judicial notice will be taken.[1]

1. The use of actuaries, economists and mathematicians as expert witnesses to provide estimates on present value of prospective earnings, the rate of infla-

The decedent was a well-adjusted individual, who led a very wholesome life. He was a devoted church member and a considerate husband and father. As a result of his mechanical skill, he was particularly helpful about the home.

He was devoted to his children and, from the testimony, gave a great deal of time to them. He took considerable interest in their recreation and often participated in their games. All in all, the testimony makes abundantly clear that he was a devoted and loving father.

The deceased was at the time of his injury in excellent health. For many years he had experienced no serious illness. There was nothing in the record to indicate any ailment that would affect adversely his life expectancy. Without any injurious habits and following a line of work involving no unusual hazards, he had a life expectancy under the South Carolina mortality tables, at the time of his death, of 38 years.

The decedent's injuries were severe and, within a short time, resulted in his death. The defendant argues that, at the time of the accident, the decedent was rendered immediately unconscious. On the other hand, there was considerable testimony that he was heard groaning and uttering on several occasions words indicating pain. He was also observed to move slightly his body as he was being transferred to the ambulance some fifteen or more minutes after the accident. The defendant proffered medical testimony that these movements and the groaning of the decedent may well have been subconscious.

The plaintiff seeks, as I have indicated, recovery both for conscious pain and suffering and wrongful death. The claim for conscious pain and suffering will be first disposed of.

## (1) PAIN AND SUFFERING CAUSE OF ACTION

 It is settled that recovery under this cause of action can only be had for *conscious* pain and suffering and the burden of establishing such rests on the plaintiff. Camp v. Petroleum Carrier Corp. (1944), 204 S.C. 133, 139, 28 S.E. 2d 683; Croft v. Hall (1946), 208 S.C. 187, 193, 37 S.E.2d 537; Bowers v. Charleston & W. C. Ry. Co. (1947), 210 S.C. 367, 372–373, 42 S.E.2d 705; Folk v. United States (D.C.S.C.1952), 102 F.Supp. 736, 741; Downing v. Ulmer (D.C.S.C.1966), 253 F.Supp. 694, 698.

 The testimony of conscious pain and suffering on the part of the decent is not undisputed. The decedent lived for only about one hour and fifteen minutes after the accident. The fact that he groaned and uttered somewhat indistinct exclamations of pain may well have been subconscious. Compare, Bowers Case, 210 S.C. p. 373, 42 S.E.2d 705. His reaction, when placed on the stretcher, may have been, as the medical testimony indicated, a possible reflex action of the nerve and muscles. However, I

tion, anticipated wage changes, etc., has been increasing. See Har-Pen Truck Lines, Inc. v. Mills (C.C.A.Ga.1967), 378 F.2d 705, 712, note 4; Legare v. United States (D.C.Fla.1961), 195 F.Supp. 557, 561. In general, the admissibility of such testimony has been accepted. 79 A.L.R. 2d 259. But, cf., Kowtko v. Delaware and Hudson Railroad Corp. (D.C.Pa. 1955), 131 F.Supp. 95, 107, stating a contrary Pennsylvania ruling. However, some courts have expressed doubt about such testimony and have severely restricted it. Wetherbee v. Elgin, Joliet, & Eastern Railway Co. (C.C.A.Ill.1951), 191 F.2d 302, 310–311 is representative of such authorities. Allendorf v. Elgin, Joliet, & Eastern Railway Co. (1956),

8 Ill.2d 164, 133 N.E.2d 288, 79 A.L.R. 2d 241, cert. denied 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53, reh. den. 352 U.S. 937, 77 S.Ct. 219, 1 L.Ed.2d 170, seems to strike a balance between the viewpoint which admits without qualification such testimony and that which doubts its value or propriety. Under the rule suggested in this latter case, the expert witness is restricted, in estimating present value, for instance, to the use of what the court describes as "neutral figures". Specifically, it would not permit the use of the figures developed in the evidence in the particular case. The suggestion seems meritorious and represents a wise restriction on such expert testimony.

am inclined to the opinion and do hereby find that the preponderance of the evidence indicates that the decedent did suffer some conscious pain before his death. It was, though, of short duration. Under such circumstances, a reasonable award under this cause of action would be $3,500.00, for which judgment is allowed.

### (2) WRONGFUL DEATH ACTION

The measure of damages in an action for wrongful death under the Federal Tort Claims Act [2], arising in the State of South Carolina, is governed by the South Carolina Death Statute [3]. Hatahley v. United States (1956), 351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065; Patrick v. United States (C.C.A. S.C.1963), 316 F.2d 9, 10. By the terms of such statute, "damages * * * proportioned to the injury resulting from such death to the parties respectively for whom and for whose benefit such action shall be brought" are recoverable [4]. The elements of the "damages" thus authorized, have been defined as "(1) Pecuniary loss, (2) mental shock and suffering, (3) wounded feelings, (4) grief and sorrow, (5) loss of companionship, and (6) deprivation of the use and comfort of the intestate's society". Mishoe v. Atlantic Coast Line R. Co. (1938), 186 S.C. 402, 419, 197 S.E. 97, 104; Norwood v. A. C. L. R. Co. (1943), 203 S.C. 456, 471, 27 S.E.2d 803; Jennings v. McCowan (1949), 215 S.C. 404, 426, 55 S.E.2d 522, cert. denied Atlantic Coast Line R. Co. v. Jennings, 338 U.S. 956, 70 S.Ct. 494, 94 L.Ed. 590; Gomillion v. Forsythe (1950), 218 S.C. 211, 225, 62 S.E.2d 297, 53 A.L.R.2d 169; Nelson v. Charleston & W. C. Ry. Co. (1957), 231 S.C. 351, 359, 98 S.E.2d 798; Elliott v. Black River Elec. Co-Op. (1958), 233 S.C. 233, 265, 104 S.E.2d 357, 74 A.L.R.2d 907; Greene v. Miller (D.C.S.C.1953), 114 F.Supp. 150, 155; Hardy v. United States (D.C.S.C.1960), 187 F.Supp. 756, 762.[5]

Of the elements of damages thus specified, only "pecuniary loss" to the beneficiaries lends itself to any rough formula of rationalized calculation, though, even here, the formula cannot be exact (Hicks v. Herring, 1965, 246 S.C. 429, 436, 144 S.E.2d 151) and "[n]o hard and fast rule * * * is possible" (Mich. Cent. R. R. v. Vreeland, 1913, 227 U.S. 59, 71, 72, 33 S.Ct. 192, 196, 57 L.Ed. 417). Broadly stated, the controlling considerations in fixing "pecuniary loss" are (1) the prospective earnings of the decedent subsequent to death, (2) calculated on the basis of his "work expectancy", and (3) the extent to which his statutory beneficiaries "might logically and reasonably have been expected to share in" such prospective earnings. O'Connor v. United States (C.C.A.N.Y. 1959), 269 F.2d 578, 582. And although, in the case of a widow and surviving children, there is a presumption of "pecuniary loss" (Ellison v. Simmons, 1961, 238 S.C. 364, 370, 120 S.E.2d 209), the actual determination of the "loss" should be established through "facts and data" duly proven, sufficient to furnish "a basis from which" the jury or Court "may approximate the proper amount with reasonable certainty." Mishoe v. Atlantic Coast Line R. Co., supra, 186 S.C. at p. 422, 197 S.E. at p. 106.

Absent presumption of pecuniary loss (as in the case of widow and surviving children), proof of actual loss is necessary for recovery of "pecuniary loss." Accordingly, pecuniary loss was denied a parent by reason of the wrongful death of his minor child. Mock v. Atlantic Coast Line R. Co. (1955), 227 S.C. 245, 87 S.E.2d 830; Patrick v. United States, supra; Gregg v. Coleman (D.C.S.C.1964), 235 F.Supp. 237. See, also, Nelson v. Charleston & Western Car. Ry. Co., supra, where the same rule

---

2. Sections 2671 et seq., 28 U.S.C.A.

3. Sections 1951, et seq., Title 10, Code of 1962.

4. Section 1954, Title 10, Code of 1962.

5. For an appropriate jury charge incorporating these elements of damages, see Craven v. Associated Transport, Inc. (D.C.S.C.1966), 40 F.R.D. 8, at p. 11.

was applied in the case of brothers suing for the wrongful death of a sister. The reasoning behind this conclusion was stated in Gilliam v. Southern Ry. Co. (1917), 108 S.C. 195, 200, 93 S.E. 865, 867, thus:

> "It follows, however, that, although the technical right may exist, yet the deprivation of it may cause very little, or, possibly, no actual financial loss, for it may be shown from the relation, circumstances, and relative condition of deceased and the surviving relatives for whose benefit the action is brought that no actual pecuniary loss, present or prospective, resulted to them from his death; and it is well settled that it is only for such loss that recovery may be had."

The customary starting-point for arriving at a decedent's "prospective earnings", the first factor in calculating pecuniary loss, is his earning base at time of his fatal accident. Matthews v. Porter (1962), 239 S.C. 620, 635, 124 S.E.2d 321; Conte v. Flota Mercante Del Estado (C.C.A.N.Y.1960), 277 F.2d 664, 669; Kane v. Fields Corner Grille (1961), 341 Mass. 640, 171 N.E.2d 287, 290.[6]

There is, of course, no certainty that such "earnings" would have continued at that level. Wetherbee v. Elgin, Joliet & Eastern Ry. Co. (C.C.A. Ill.1951), 191 F.2d 302, 311. As stated in Har-Pen Truck Lines, Inc. v. Mills, supra, 278 F.2d p. 709, "Past earnings are indicative but not conclusive". The security of his employment,[7] "his chances for future promotion or demotion",[8] his likelihood of wage increases,[9] particularly

---

6. In Matthews v. Porter, the Court said:
 "The purpose in admitting evidence of earnings from past employment in any case is to enable the jury to determine what the future earnings would have been but for the injury. Any earnings from such employment which may fairly and legitimately throw light upon what the probable future earnings would have been is admissible for that purpose. There seems to be no fixed rule as to time in such inquiry, but past employment must be sufficiently related to the probable future employment of the plaintiff to be reasonably considered as a guide for determining future earnings. Fox v. Asheville Army Store, Inc., 216 N.C. 468, 5 S.E. 2d 436."
 Again, in the *Conte* Case, the Court said:
 "In order to determine libelant's normal future annual earning power the District Judge looked, appropriately enough, to what he had been earning in the past."

7. Porello v. United States, (C.C.A.N.Y. 1946), 153 F.2d 605, 608–609; Rowan v. Western Kentucky Gas Co. (D.C.Ky. 1949), 82 F.Supp. 591, 595. Involved in this, too, is the fact that, in many types of employment, earning power decreases with advancing years. Kowtko v. Delaware and Hudson Railroad Corp. (D.C.Pa.1955), 131 F.Supp. 95, 105.

8. O'Connor v. United States, supra, 269 F.2d at p. 582. But, cf., Sabine Towing Co. v. Brennan (C.C.A.Tex.1936), 85 F.2d 478, 481:
 "We may not consider what might happen in the future. The earnings of the deceased might have increased or diminished had they lived."
 Cf., also, Jennings v. United States (D.C.Md.1959), 178 F.Supp. 516, (rev. on other grounds, 4 Cir., 291 F.2d 880 and reinstated 4 Cir., 318 F.2d 718), where the Court said that possible promotions "are all so speculative that the court will assume merely that he would have remained in Grade 11 and received periodic increases until his death."
 In any event, a finding in favor of promotion cannot be "based on speculation or guesswork" (De Vito v. United Air Lines (D.C.N.Y.1951), 98 F.Supp. 88, 99), and, to use the striking phrase of Judge Kaufman in Rogow v. United States (D.C.N.Y.1959), 173 F.Supp. 547, 561, this is not an area where the Court is "at liberty to fictionalize."

9. Petition of Marina Mercante Nicaraquense, S.A. (D.C.N.Y.1965), 248 F. Supp. 15, 26–27, (rev. on other grounds, 2 Cir., 364 F.2d 118) cert. den. 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544. But, in upholding the position that "future earnings should be calculated on the basis of increased wage rates and also advancement in position," the Court added this *caveat:*
 "While the industry has been favored with periodic wage raises and fringe benefits, also to be considered are the

as they may be occasioned by inflation,[10] all are factors to be given their proper weight in attempting to establish a reasonable basis for "prospective earnings".

Such "prospective earnings", determined under these principles, are to be spread over the decedent's appropriate expectancy, which "is usually determined by life tables * * * although a more refined analysis would permit reduction of the figures in the tables to take account of 'the probable duration of plaintiff's earnings capacity' (presumably with due regard to pension rights thereafter), * * * and also of conditions * * * that might have reduced plaintiff's expectancy below the normal term." McWeeney v. New York, N. H. & H. Ry. Co. (C.C.A.N.Y.1960), 282 F.2d 34, 35–36, cert. denied 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93. In short, it is the probable duration of the plaintiff's earning capacity—his "work expectancy"—over which the estimate of his prospective annual earnings must be spread and not his life expectancy. Conte v. Flota Mercante Del Estado, supra, 277 F.2d at p. 670; Holliday v. Pacific Atlantic S. S. Co. (D.C.Del.1953), 117 F.Supp. 729, 734; aff. 3 Cir., 212 F.2d 206; Petition of Oskar Tiedemann & Company (D.C.Del.1964), 236 F.Supp.

895, 904. Where, as in this case, the deceased's employer had an established retirement policy, followed by a pension program, the work expectancy of the deceased will conform to such retirement policy. Of course, as the Court suggested in the McWeeney Case, supra, "pecuniary loss" would also include the pension rights of the decedent, from date of retirement to the end of his life expectancy, reduced to present value. Murray v. New York, New Haven & Hartford R. Co. (C.C.A.N.Y.1958), 255 F.2d 42, 45.[11]

In ascertaining the "extent" to which the beneficiaries of the action might "logically and reasonably have been expected to share in" such prospective earnings, certain deductions are proper. The most troublesome of such deductions —about which there is considerable difference of opinion in the decisions— revolves about the treatment of income taxes.

The argument in favor of the deduction is compelling. The beneficiaries of an action such as this are only entitled to recover the amount of their actual loss. If the deceased had lived, his future earnings would have been subject to income taxes and the amount available for those entitled to support from him would have been *after taxes*.[12] However, damages awarded for

---

hazards of economic dislocation, unemployment, reduced earning capacity by reason of age and other adverse factors."

10. Newman v. Brown (1955), 228 S.C. 472, 478, 90 S.E.2d 649, 55 A.L.R.2d 929; Rogers v. Atlantic Coast Line R. Co. (1952), 222 S.C. 66, 77, 71 S.E.2d 585; Richardson v. General Motors Acceptance Corp. (1952), 221 S.C. 14, 22, 68 S.E.2d 874; Southern Pac. Co. v. Zehnle (C.C.A.Cal.1947), 163 F.2d 453, 454; Annotation, 12 A.L.R.2d 611.

See, also, "Fluctuating Dollars and Tort Damage Verdicts," 48 Cola.L.Rev., p. 264.

11. In this case, it seems proper to accept, and I so find, the life expectancy as fixed by the mortality tables, even though it is settled that such tables are not rigid formulae, inflexible in their ap-

plication, but merely guides to be used as they may appear relevant in the particular case. Wetherbee v. Elgin, Joliet, etc., Ry. Co., supra; Thompson v. Camp (C.C.A.Tenn.1947), 163 F.2d 396, 403, cert. denied 333 U.S. 831, 68 S.Ct. 458, 459, 92 L.Ed. 1116; Renaldi v. New York, New Haven & Hartford R. Co. (C.C.A.N.Y.1956), 230 F.2d 841, 845, 59 A.L.R.2d 1371. See, particularly, Tabor v. Miller (D.C.Pa.1967), 269 F.Supp. 647, 651, for situation in which mortality tables were inapplicable. The decedent was, as I have already found, in good health, had good habits, and was subject to no unusual hazards in his work.

12. O'Connor v. United States (C.C.A.N.Y. 1959), 269 F.2d 578, 584–585:

"The deceased, as a salaried employee, never had in his own hands the amount withheld from his earnings for

wrongful death, so far as they encompass prospective earnings, are non-taxable.[13] Unless such damages take income taxes into consideration, the beneficiaries will accordingly be receiving more than they would have had the deceased lived.[14] Accordingly, 2 Harper & James, The Law of Torts, sec. 25.12, sums the matter up:

> "The argument for computing damages on estimated income after taxes is a clear one; this will measure the actual loss. If plaintiff gets, in tax free damages, an amount on which he would have had to pay taxes if he had gotten it as wages, then plaintiff is getting more than he lost."

The objection most often directed against such deduction is its so-called speculative nature. Thus, in the Cunningham Case, supra, 333 F.2d p. 314, the Court phrased it that "the crucial issue is whether a court can predict with sufficient certitude just what portion of decedent's earnings would have been placed beyond libelant's reach by future tax laws so as to permit the court justly to reduce the damage award which libelant would otherwise be entitled to." But, as 2 Harper & James, The Law of Torts,

sec. 25.12, replied, "future taxes are no more speculative than many other items that go into prophecies about future losses in this uncertain world." See, also, the dissenting opinion of Judge Lumbard in McWeeney v. New York, N. H. & H. R. R. Co. (C.C.A.N.Y.1960), 282 F.2d 34, at p. 42. Assuredly, the incidence of future income taxes is no more "guess work" and no more difficult of exact calculation than possible future advancement, wage increases and inflation, all matters to be taken into account in calculating future income. Nor is it to be forgotten that mathematical precision in fixing damages is not demanded. After all, "Insistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience." Whitaker v. Blidberg Rothchild Co. (C.C. A.Va.1961), 296 F.2d 554.[15]

This asserted want of "sufficient certitude" is most often predicated upon the claim that changes in taxable deductions, such as increases in dependents, may subsequently occur, making impossible any fair calculation of future tax. Such argument may be applicable to a personal

---

Federal Income Tax purposes; and his wife and child could have no direct benefit from that part of his earnings. * * * The compensatory nature of the right to damages under the Tort Claims Act requires such consideration of Federal Income Taxes; the plaintiff-appellee can recover only for losses sustained."

See, also, dissenting opinion in Cunningham v. Rederiet Vindeggen (C.C.A. N.Y.1964), 333 F.2d 308, 319:

"This is a day and age of 'take home' pay. As this court held in O'Connor, the amount which the deceased employee had to divide with his wife and child was the amount he actually received. No part of his income tax deduction came to him."

13. Section 104(a)(2), 26 U.S.C.A.; Rev. Rul. 19, 1954–1 Cum.Bull. 179; Anderson v. United Air Lines (D.C.Cal.1960), 183 F.Supp. 97.

14. Floyd v. Fruit Industries, Inc. (1957), 144 Conn. 659, 136 A.2d 918, at p 925, 63 A.L.R.2d 1378, at p. 1390:

"* * * the probable income taxes of the decedent must be deducted from his probable lifetime net earnings to get any fair or proper basis for assessing reasonable compensation for the loss caused by the destruction of his earning capacity. It would be difficult to conceive of a more unjust, unrealistic or unfair rule than one which would lead a jury to base their allowance of reasonable compensation for the destruction of earning capacity on the hypothesis that no income taxes would be paid on net earnings. For all practical purposes, the only usable earnings are net earnings after payment of such taxes."

15. Even those courts which deny any consideration of tax consequences generally allow such consideration in connection with awards of damages between death and award. Petition of Oskar Tiedemann & Co. (D.C.Del.1964), 236 F.Supp. 895, 907.

injury suit but has little relevancy to a death action. This difference was emphasized by Professor Wright in the symposium on damages for personal injuries in 19 Ohio St. Law Journal (1958), p. 157: "The hard fact—inevitable in a subject which grew first carelessly and then explosively—is that a number of the existing rules cannot be justified in theory. For example, I think a good argument can be made for ignoring income tax in computing damages in a suit for personal injuries, but that it is completely unsound to use earnings before tax as a measure in a death action. Authoritative doctrine, to date, has made no distinction between the two kinds of suits."

Supporting this final comment of Professor Wright is the fact that many of the cases denying consideration of tax consequences in a damage suit award involved personal injury actions; but the distinction between such and a death action is not even suggested. Thus, the argument advanced by Judge Friendly in the *McWeeney* Case, 282 F.2d 34, at pp. 36–37, which was a personal injury case, is based to a large extent upon the possibility of increased family dependents and the inappropriateness for the jury "to speculate, or hear testimony, on the procreative proclivities and potentialities of the plaintiff and his spouse". These considerations clearly are not present in a death case, as Professor Wright indicated.

It must be recognized, too, that another reason influencing courts against allowing consideration of income taxes is the feeling that it "would unduly complicate the trial" both in the admission of evidence and in the instructions to the jury.

63 A.L.R.2d 1404; McWeeney v. New York, etc. R. Co., supra.[16] As Judge Bryan, in reply to a somewhat similar argument in Todd v. Sandidge Construction Company (C.C.A.S.C.1964), 341 F.2d 75, 77, said, such contention "has the appeal of simplicity. It might aid the judiciary but hardly justice." If simplicity in instructions is a test, it would seem that other matters considered by the jury are equally vulnerable. As Justice Bonham pointed out in Grimsley v. Atlantic Coast Line R. Co. (1939), 189 S.C. 251, 257, 1 S.E.2d 157, 160, "Frankly, it seems to us that when the jury is instructed that they must reduce the amount of damages found by them for future earnings or benefits, to their present cash value, and there is no standard or rule given them by which to measure or estimate such present cash value, they are left to flounder in doubt, or else in conjecture or speculation." Yet the failure to submit such issue is reversible error under many authorities. Youngblood v. Southern R. Co. (1927), 152 S.C. 265, 277, 149 S.E. 742, 77 A.L.R. 1419; Daughtry v. Cline (1944), 224 N.C. 381, 30 S.E.2d 322, 154 A.L.R. 789. Moreover, these considerations are not applicable when the case is non-jury. Compare, however, Petition of Marina Mercante Nicaraquense, S. A. (C.C.A.N.Y.1966), 364 F.2d 118, at pp. 125–126. Certainly, as the annotation in 63 A.L.R.2d 1397, observes,

"Where the damages are assessed by the court (as is usually the situation in England where it has become customary to try negligence cases to the court without a jury) rather than by the jury, it would seem to be at least more feasible to take income tax conse-

---

16. In commenting adversely on the majority opinion in the *McWeeney* Case, denying consideration of income taxes in death awards, 22 Ohio State Law Journal, 229, states:
 "If more ideal justice is to prevail, then courts must accept the challenge of the tax problem and in cases such as this, present the appropriate instructions to the jury when requested."
 Again, in commenting on this same case, 50 Ky.Law Journal, 604, after stating that,
 "Courts are evading their responsibilities when they decline to make the best guess they can"
 in connection with taxes, concluded:
 "However, it is submitted that the arguments in favor of such instructions (on the deductibility of income taxes) not only refute those supporting its impropriety but outweigh them."

quences into consideration in fixing the damages. For one thing, in such a case the problem of how to instruct the jury does not arise."

It must be conceded that, as the Court in United States v. Sommers (C.C.A. Colo.1965), 351 F.2d 354, 360, put it, "there is little agreement to be found in the reported cases regarding the application of possible income tax liability to damage awards based upon the prospective earnings of a deceased or injured person." [17] In fact, in the Second Circuit, the Court has adopted a flexible rule, varying with the amount of the earnings involved: Income taxes "should not be deducted * * * at the lower or middle reach of the income scale" but should "at the opposite end of the income spectrum" (Petition of Marina Mercante Nicaraquense, S. A., (C.C.A.N.Y.1966), 364 F.2d 118, 125) [18] a conclusion prompt-

ing this comment in 14 Vanderbilt Law Rev. 642:

"To allow the size of plaintiff's income to be the controlling factor would discriminate between plaintiffs on a basis having no relation to the amount of damages suffered and would not reduce the conjecturality as to future tax liability."

Other cases have, in non-jury cases at least left the matter largely to the discretion of the trial court. LeRoy v. Sabena Belgian World Airlines (C.C.A. N.Y.1965), 344 F.2d 266, 281, cert. den. 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119; United States v. Sommers, supra.

The South Carolina Supreme Court has not resolved this issue nor has our own Circuit Court of Appeals committed itself. The latter Court has touched on the point, however, in two cases.[19] In

17. For representative federal cases, supporting the deductibility, see O'Connor v. United States, supra; Nollenberger v. United Air Lines, Inc. (D.C.Cal.1963), 216 F.Supp. 734, 743, mod. on other grounds 9 Cir., 335 F.2d 379, cert. den. 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549; Moffa v. Perkins Trucking Company (D.C.Conn.1961), 200 F.Supp. 183, 188.

For the contrary view, see McWeeney v. New York, N. H. & H. R. Co., supra; Culley v. Pennsylvania Railroad Company (D.C.Del.1965), 244 F.Supp. 710, 715; Christopher v. United States (D.C.Penn. 1965), 237 F.Supp. 787, 797, note 3. See, also, United States v. Sommers (C. C.C.A.Colo.1965), 351 F.2d 354, 360, which indicates deductibility is discretionary in the Trial Court.

The legal periodical discussion of the issue is well summarized in the Jennings Case, supra, 178 F.Supp. p. 532. For later discussion, see, among others, Shipman, Income Tax Aspects of Personal Injury Litigants, 37 Tex.Law Rev. 77 (1958); 22 Ohio State Law Journal 225 (1961); 14 Vanderbilt Law Journal, 639 (1961); 50 Ky.Law Journal, 601 (1962).

The majority view seems to be against the deductibility (Annotation, 63 A.L.R. 2d 1393) but the "modern trend" appears definitely in the opposite direction. Furumizo v. United States (D.C.Hawaii 1965), 245 F.Supp. 981, 1014.

18. The practical application of this rule of flexibility is spelt out by the Court in its review of previous decisions of the Court. In the McWeeney Case, supra, where deduction was denied the annual income involved was $4,800.00. In the Cunningham Case, supra, where again deduction was disallowed, the annual income was $6,281.00. The Court stated that, while the District Court in Montellier v. United States (C.C.A.N.Y.1963), 315 F.2d 180, 186, had determined against deductibility, the income range in that case (i.e., between $11,000.00 and $12,-000.00) made the deductibility discretionary with the District Court. In LeRoy v. Sabena Belgian World Airlines (C.C. A.N.Y.1965), 344 F.2d 266, 276, cert. den. 382 U.S. 878, 86 S.Ct. 161, 15 L. Ed.2d 119, the Court held the deduction was appropriate in a case involving a $16,000.00 annual earning. Finally, in Petition of Marina Mercante Nicaraquense, S.A., supra, deductibility was denied where income was approximately $11,000.00.

19. In Gardner v. National Bulk Carriers, Inc. (D.C.Va.1963), 221 F.Supp. 243, 245, the District Court held, that, "As a practical matter the overall tax picture plays no part in this case" and refused to follow O'Connor v. United States, supra. This point was apparently not pressed on appeal, however; and the decision of the appellate court makes no reference to this conclusion of the District Court in its opinion on appeal. 4 Cir., 333 F.2d 676.

Virginian Ry. Co. v. Armentrout (C.C.A. W.Va.1948), 166 F.2d 400, 407, 4 A.L.R. 2d 1064, it apparently approved of the action of the District Court (72 F.Supp. 997, 1004) in using the income tax liability to test for excessiveness a jury award in a death case, though it concluded that the District Court was not realistic in assuming a future reduction in such income taxes, a conclusion well borne out by subsequent events. In the other case, in which the District Court, after adverting adversely to the deduction for income taxes in a death case, concluded that such item was "one of the relevant elements in fixing the award" (Jennings v. United States, supra), the Court said (291 F.2d 880 at p. 888):

"The Government also insists that the District Court, in computing damages in the death action, should have deducted from the award prospective income taxes that the decedent would have had to pay on his future earnings. Without intending to express an opinion on the propriety of such deduction, we note that the District Judge stated that 'the decedent's liability for taxes has been considered as one of the relevant elements in fixing the award'. Since this item evidently was considered, the Government has no cause to complain."

It is clear, therefore, that this issue is an open one in this jurisdiction. Free thus to follow the commands of reasonable justice, I am of opinion that the arguments for considering such income tax consequences in a death case (as distinguished from a personal injury case) are so logical and compelling, especially in a non-jury case, that a reasonable deduction from prospective earnings on account of income taxes should be made in this case.

 However, it must be recognized that a part of the award for prospective earnings will be subject to income taxes. The interest on the award which repre-sents the amount of the discount (discussed infra) will be subject to tax. See, Southern Pac. R. Co. v. Guthrie (C.C.A. Cal.1949), 180 F.2d 295, at p. 302, note 7, cert. den. 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343; Meehan v. Central Railroad Company of New Jersey (D.C.N.Y. 1960), 181 F.Supp. 594, 623–634. Giving proper consideration to this item and adjusting the rate accordingly, I am of the opinion that a 10 per cent tax rate imposed, after taking into account the benefit of the split income feature of the tax laws, as well as the standard deduction and allowance for family deductions, is fair and proper.

 In establishing the pecuniary loss of the beneficiaries, there must, also, be deducted from the prospective earnings after taxes "the probable cost of his (the decedent's) living and other expenses". United States v. Brooks (C.C. A.N.C.1949), 176 F.2d 482, 484–485. The proper allowance for such item is seldom a matter of credible proof and "defies any precise mathematical computation". Floyd v. Fruit Industries, supra, 144 Conn. 659, 136 A.2d 918, 63 A.L.R.2d at p. 1392. In large part such determination must rest upon considerations of common sense and normal experience. Petition of Petroleum Tankers Corp. (D.C.N.Y.1960), 204 F.Supp. 727, 734. While, as the Court in Petition of Marina Mercante Nicaraquense, S.A. (D.C.N.Y.1965), 248 F.Supp. 15, 27, note 31, reversed on other grounds in 364 F.2d 118, remarked, "Understandably, no particular pattern (for fixing such determination) emerges from the various cases", "a variant allocation according to the number of minor children" in the surviving family has been applied in the reported cases, "ranging from 83½%, when there were five minors in the family, to 50%, for the wife alone". In this case, I have determined that an allocation of 80 per cent for the widow and her children is proper, reducing 10 per cent as each minor attains his ma-

jority[20] and leveling off at 50 per cent for the wife alone, after all the children have reached their majority.[21]

It was suggested, during trial, that some consideration in the award should be given for the possibility of the widow's remarriage. The authorities, however, are clear that no such consideration is admissible. United States v. The S.S. Washington (D.C.Va.1959), 172 F.Supp. 905, 908, aff. 4 Cir., 272 F.2d 711; Blumenthal v. United States (D.C. Pa.1960), 189 F.Supp. 439, 449, aff. 3 Cir., 306 F.2d 16; Johns v. Baltimore & Ohio Ry. Co. (D.C.Pa.1956), 143 F.Supp. 15, 28, aff. 3 Cir., 239 F.2d 385; Curnow v. West View Park Co. (D.C.Pa.1963), 220 F.Supp. 367, 373–374, rev. on other grounds 3 Cir., 337 F.2d 241; The City of Rome (D.C.N.Y.1930), 48 F.2d 333, 343; Chicago & E. I. R. Co. v. Driscoll (1903), 207 Ill. 9, 69 N.E. 620, 622–623; Annotation, 30 A.L.R. 123.[22]

It is settled that these "prospective earnings", (but not earnings estimated between date of death and date of award) established in accordance with the foregoing rules, must be reduced to present value. Grimsley v. Atlantic Coast Line R. Co. (1939), 189 S.C. 251, 256, 1 S.E.2d 157; MacMullen v. South Carolina Electric and Gas Company (D.C. S.C.1961), 205 F.Supp. 811, 814. In fact, in O'Connor v. United States, supra, 269 F.2d p. 585, the Court said that, in proceedings under the Tort Claims Act, "a discount factor must be applied as a matter of Federal law."

The rate of discount is one that has varied with the decisions. As the Court pointed out in Southern Pacific Co. v. Guthrie (C.C.A.Cal.1951), 186 F.2d 926, 927, "There is of course no rule of law which determines the probable rate of interest obtainable upon investments in safe securities." In 105 A.L.R. 235, it is stated that, "From the cases in which the rate which was used appears, the courts would seem to be inclined to adopt the 'legal rate' of interest as the proper rate of discount, contrary to the rule established for cases under the Federal Employers' Liability Act." However, in Chesapeake & Ohio Ry. v. Kelly (1916), 241 U.S. 485, 490, 36 S.Ct. 630, 632, 60 L.Ed. 1117, L.R.A.1917F, 367, an Employers' Liability Case, the Court said:

"We do not mean to say that the discount should be at what is commonly called the 'legal rate' of interest; that

---

**20.** Gardner v. National Bulk Carriers, Inc. (D.C.Va.1963), 221 F.Supp. 243, 246, affirmed 4 Cir., 333 F.2d 676:

"The son, age 4 at the time of his father's death, has no right to recover for any pecuniary loss beyond the time he attains the age of 21."

**21.** See, O'Connor v. United States, (C.C.A. N.Y.1959), 269 F.2d 578, 583, where it was held that as a child reached majority, his share of the pecuniary loss must be eliminated from the award and "the wife would be entitled to a maximum allocation to herself of no more than one-half of the household and family expenses." To same effect, Montellier v. United States (D.C.N.Y.1962), 202 F. Supp. 384, 423, affirmed 2 Cir., 315 F. 2d 180.

Cf., also, Thompson v. Camp (C.C.A. Tenn.1947), 163 F.2d 396, 403, cert. denied 333 U.S. 831, 68 S.Ct. 458, 92 L. Ed. 116, where the Court held that failure to charge "that the jury should not include any amount as contributions which the children would have received

after they attained the age of twenty-one, since it is not presumed that they would receive (d) any pecuniary benefits from the deceased thereafter" was reversible error.

**22.** In Seaboard Air Line Railway Company v. Connor (C.C.A.Va.1958), 261 F.2d 656, the District Court had, in its charge, authorized the jury, in fixing damages, to take account of the widow's remarriage. Quoting the annotation in 30 A.L.R. and indicating that it differed with the ruling of the District Court, the appellate court merely said that the instruction was "at least as favorable an instruction as was permissible".

In Indemnity Ins. Co. of N. America v. Odom, (1960) 237 S.C. 167, 116 S.E.2d 22, the widow's remarriage was noted, thereby ceasing, it was claimed, "to be a dependent", but, without considering the point in any detail, the Court dismissed it with the observation (p. 182), "but the decedent also left as dependents some minor children."

is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon investments on safe securities, at least, without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation should be awarded upon a basis that does not call upon the beneficiaries to exercise such skill, * * *." [23]

 This latter rule has generally been applied in actions under the Federal Tort Claims Act. In O'Connor v. United States, supra, 269 F.2d at p. 585, the Court said that it could not hold "that any rate between 3% and 4½% is wrong as a matter of law." Actually, rates ranging from 3 per cent to 6 per cent have been used. The matter is one for the exercise of common sense and sound judgment. While expert testimony was offered by the plaintiff on a reasonable discount figure,[24] the question is one governed largely by factors of which the Court will take judicial notice. Southern Pacific Ry. Co. v. Gutherie, supra. Under present circumstances and current interest rates, I am of opinion that a 4¼ per cent discount rate is appropriate.

 To summarize, the "pecuniary loss" of the beneficiaries of the death action is to be established by (1) fixing prospective earnings, taking into account likely promotions, wage increases and inflationary effects on what would have been decedent's future earnings, (2) deducting therefrom a reasonable amount by way of income taxes thereon, and (3) decedent's reasonable share of household and personal expense, (4) discounted to present value (except as to earnings between death and award), (5) multiplied by his work expectancy. To this must be added his pension income for retirement to end of his life expectancy, discounted to present value.

Applying these principles, I find that, at his death, the earnings of the decedent, annualized on the basis of his earnings for the first 15½ weeks of such year, were $9,621.56. Such earnings compared with average earnings over the previous three years of $7,649.30. Between the date of death and September 15, 1967 (the date of this award), various wage increases were put into effect by the National Cash Register Company. Assuming such wage increases and a similar amount of overtime to that averaged over the last three years prior to his death, the annual earnings of the decedent would, as of September 15, 1967, without any promotion in job, have been $9,344.45.

 For the period from death to date of this award (September 15, 1967), the plaintiff would be entitled, by way of pecuniary loss, to the earnings that decedent would have received in his job classification at time of death, adjusted for all wage increases given by his employer during the period and allowing for overtime as fixed by the average amount thereof for the three years immediately prior to his death, after deducting (1) federal income taxes calculated as set forth, supra, and (2) his personal household and living expenses calculated as previously established. It is agreed that, on this basis of calculation, the amount of recovery for this item is $9,843.07.

For the period subsequent to September 15, 1967, I begin with decedent's earnings, $9,344.45, heretofore found to have been his earnings as of September 15, 1967, had he lived. There is no reason to assume that he would not have continued in the employment of the National Cash Register Company or that he would have suffered any diminution in

---

23. See, Southern Railway Company v. Neese (C.C.A.S.C.1954), 216 F.2d 772, rev. 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60, on other grounds, the Court, in considering the excessiveness of a verdict, used discount rates from 3 to 5 per cent.

24. The use of expert testimony to establish a historical pattern of interest rates is of doubtful value. Interest rates, in this modern period, are fixed largely by governmental policy, rather than by any historical movement.

base salary. Indeed every indication points to increases in such base salary. Under such circumstances, his base earnings on September 15, 1967, for purposes of establishing future pecuniary loss, must be increased to give effect to any likely promotions, wage increases, and inflation, during the decedent's work expectancy.

In attempting to visualize advancement in a large organization such as National Cash Register Company, on the basis of the testimony of the decedent's fellow employees in the Columbia sales and service branch of that Company, is largely "to fictionalize". In determining whether decedent would have been promoted to service manager in some larger branch than that in Columbia, for instance, is not to be resolved merely by the opinion that the decedent's fellow employees in Columbia had of his qualifications; a superior elsewhere, after reviewing the qualifications of the scores of other servicemen in the many other branches of the Company all over the nation, would make that determination. It is a comparison of the decedent's qualifications with all the other servicemen of the Company in its many other branches that is important on this issue. Again, what improvement in decedent's future earnings may have been depends as much on the amount of overtime he obtains as improvements in wage rates. That such overtime varies with the hazards of the employer's business is evidenced by the variations in overtime earnings of the decedent in the last few years of his life. All in all, balancing all factors, and recognizing that there is much "conjecture" involved, I believe and find that an increase in the above base earnings figure of 15 per cent adequately compensates for any likely promotions, wage increases, and inflationary trends. Using such percentage, the prospective annual earnings of the deceased, on and after September 15, 1967, as spread over his entire work expectancy, would be $10,746.12. After charging against this federal income taxes and personal deductions, as outlined supra, and extending it over decedent's

work expectancy of 33 years, and discounting it to present value, using the rate already determined (i. e., 4¼ per cent), the amount recoverable under this item is $116,918.75.

Following the same method of calculation for the loss of pension from date of retirement to end of life expectancy, plaintiff is entitled to an additional recovery of $3,514.93.

As an additional element of "pecuniary loss", plaintiff sets forth a claim for the reasonable value of the decedent's services about the household. To warrant such recovery, "There must be evidence that such help and care were being given and were likely to continue". O'Connor v. United States, supra, 269 F.2d at p. 584. And such evidence must be more than "sketchy". Thus, in Meehan v. Central Railroad Company of New Jersey, supra, 181 F.Supp. at p. 623, the Court, in disallowing the claim, said that, "With such a paucity of proof, this court is unable to see how such facts can be translated into monetary or pecuniary loss". Again, in Petition of Petroleum Tankers Corporation, (D.C.N.Y.1960), 204 F.Supp. 727, 734, an allowance for such services was denied, the Court putting it:

> "There is inadequate proof of any substantial pecuniary loss to the wife from the assistance, etc., of the husband. He was home as a rule only weekends. Aside from some help in dish washing and perhaps some in cooking, there was little evidence of any aid or assistance. No award is therefore made."

There is, however, reasonable evidence in this record to sustain an award on this account. The decedent was called upon to perform many tasks about the house. He had considerable mechanical aptitude and experience. He maintained, for instance, all the mechanical equipment, such as television and kitchen appliances, and looked after the maintenance of the yard. In my judgment, an award of $250.00 per year for the dece-

dent's life expectancy would be appropriate. Such sum, of course, should be discounted. This item, so calculated, amounts to $4,963.00.[25]

■ To summarize, for "pecuniary loss", under the Death Statute, (Item #1 in the *Mishoe* itemization), the plaintiff is entitled to recover:

| | |
|---|---|
| (a) Earnings from date of death to date of award | $ 9,843.07 |
| (b) Loss of earnings from date of award to end of decedent's work expectancy | 116,918.75 |
| (c) Loss of pension benefits from end of work expectancy to end of life expectancy | 3,514.93 |
| (d) Loss of reasonable value of decedent's services about household for life expectancy | 4,963.00 |
| Total pecuniary loss | $135,239.75 |

——————◆——————

■■ The children are entitled to recover for the loss of their father's companionship, as well as for that of nurture, guidance and training.[26] It is difficult to value such services, which do not lend themselves to mathematical exactness. It is, however, my opinion that $300.00 per year during the minority of such child, discounted at the same rate as that fixed for decedent's prospective earnings should be recoverable for each surviving child for loss of nurture, guidance and training. This item, calculated for all three children, is $9,146.86. In addition, they are entitled to an award for loss of companionship, which I fix at $10,853.14. The total award under this item is $20,000.00.[27]

■■ There remains for compensation the loss of companionship and the

"comfort of the intestate's society" suffered by the widow. There is, as I have indicated, no formula for the measurement of such loss. In my opinion, the widow is entitled to an award of $25,000.00 for such loss.

Accordingly, under items (5) and (6) as enumerated in the *Mishoe* Case, plaintiff is entitled to recover, both on her behalf as widow and on behalf of her children, the sum of $45,000.00.

■ "(2) Mental shock and suffering, (3) wounded feelings, (4) grief and sorrow" are, also, compensable items, under the South Carolina Death Statute. For these, I conclude the plaintiff is entitled to recover $20,000.00.

**25.** No claim for pecuniary loss arising from loss of inheritance expectancy was made in this case. Whether such item is recoverable under South Carolina law is an open question. 19 South Carolina Law Rev., p. 226. Some jurisdictions consider it a legitimate element of damages. Note, 91 A.L.R.2d 477. But it would seem that its allowance in any event must not rest on mere surmise and conjecture but that there must be in the record adequate evidence indicating both the capacity and the intent of the deceased to seek to develop an inheritable estate. See, Spiking v. Consolidated R. & Power Co. (1908), 33 Utah 313, 93 P. 838; Burk v. Arcata & M. River R. Co. (1899), 125 Cal. 364, 57 P. 1065; Wiest v. Electric Traction Co., (1901), 200 Pa. 148, 49 A. 891, 58 L.R.A. 666.

**26.** Michigan Central R. Co. v. Vreeland (1913), 227 U.S. 59, 71, 33 S.Ct. 192, 57 L.Ed. 417.

**27.** This is a part of items (5) and (6) of the *Mishoe* classification. The other part embraces the loss suffered by the widow for these same items. There might be some argument whether this award, even as the general award, should be apportioned among the parties or included in a general award. See, Mann v. Bowman Transportation, Inc. (C.C.A. S.C., 1962), 300 F.2d 505, 511–512. However the normal practice in this State is to make a single award, which is distributable as provided in the statute of distribution. I shall follow this practice here.

To conclude, in my opinion, judgment for the plaintiff, under the Death Statute, should be awarded as follows:

(a) For pecuniary loss (Item #1, *Mishoe* Case) $135,239.75

(b) For loss of companionship (Items #5 and #6, *Mishoe* Case) 45,000.00

(c) For mental shock and suffering (Items #2, #3 and #4, *Mishoe* Case) 20,000.00

$200,239.75

———◆———

Plaintiff should, therefore, recover judgment against the defendant in this case, under the Survival Statute and under the Death Statute, in the total amount of $203,739.75.

▆ Attorneys for plaintiff are entitled to a fee of twenty per cent (20%) of the recovery, to be paid out of said recovery not in addition thereto.

A formal order for the entry of appropriate judgment, in accordance with these findings, may be submitted by counsel.