Victor R. JEFFERY, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. Civ–71–627 Phx WEC.

United States District Court,
D. Arizona.

July 12, 1974.

Somers & Arnold, Tucson, Ariz., Boccardo, Blum, Lull, Niland, Teerlink & Bell, San Jose, Cal., for plaintiff.

James P. Loss, U. S. Atty., Phoenix, Ariz., for defendant.

OPINION

FINDINGS OF FACT AND CONCLUSIONS OF LAW

CRAIG, Chief Judge.

Plaintiffs instituted this action for wrongful death to their minor son, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 et seq., and pursuant to Arizona Revised Statutes 12–612B.

On the evening of May 8, 1970, plaintiff Victor R. Jeffery and his wife, Margaret L. Jeffery, with their four children departed from Loma Linda, California, their place of residence, for the Lake Mead Recreation Area in Arizona. The Jefferys were accompanied by their friends, the Le Blancs. The Le Blanc family consisted of Theodore Le Blanc, his wife Fay and four children. Each family had a camper-type vehicle. Each family brought with them a motorcycle. The Jeffery children consisted of three girls, Nancy, 16, Karen, 15, Christine, 9, and one boy, Douglas, 8. The Le Blanc family consisted of three girls, Terry, Tammy and Tonya, ages 13, 12 and 10, and one boy, Timothy, 9.

The two families arrived at the Katherine Campgrounds on the Arizona side of the Lake Mead Recreation Area at approximately midnight of May 8, 1970. The Lake Mead Recreation Area is operated and maintained by the National Park Service, an agency of the United States Government. Neither family had visited the Lake Mead Recreation Area on any previous occasion.

Upon arrival at the campgrounds, the two families stopped at the Ranger Station near the campgrounds and found it to be closed. The two fathers observed a bulletin board in front of the Ranger Station. In implementation of 36 C.F.R. 4.19, the National Park Service had posted a typewritten notice on the bulletin board at the Ranger Station, and upon a bulletin board on the side of a comfort station. The notice was posted along with other notices. The notice read:

"Lake Mead National Recreation Area Regulations Governing Operation and Use of Motor-Driven Cycles

No motor-driven cycles may be operated off public or dirt roads. No cross-country use is permitted within the Recreation Area boundaries.

All motor-driven cycles must be currently and validly registered and licensed. There are no exceptions.

Excessive engine acceleration of a motor-driven cycle is prohibited. All motor-driven cycles must be equipped with adequate mufflers.

All operators of motor-driven cycles must have a valid vehicle operators license in their possession. No one who is not legally licensed to operate a motor-driven cycle will be permitted to operate any type of motor-driven cycle at any time in any place.

All motor-driven cycles must be equipped with a rear view mirror and footrests. Every operator and passenger must wear a protective helmet and some type of eye protection (safety glasses, goggles, windshield) at all times.

State and federal regulations applicable to motor vehicles within Lake Mead National Recreation Area also apply to all motor-driven cycles." (Plaintiff's Exhibit No. 35)

There is no evidence that any of the adult members of the party read or observed the notice.

Following their visit to the closed Ranger Station, the two families found suitable parking facilities in the public campgrounds. On May 9, 1970, the two families entertained themselves about the campgrounds and the lake. The adults in the party rode the motorcycles about the campgrounds and the public

roads in the area. At some time during the evening of May 9th, the party concluded to return home in the early morning of the following day.

In the early morning of Sunday, May 10, 1970, two Park Rangers, Harvey Sorenson and Roland Russell, assigned to the recreation area, observed two young boys astride motorcycles adjacent to the parked campers of Jeffery and Le Blanc. The rangers advised the boys they were too young to be riding motorcycles in the area. At approximately this point in time the boys and the rangers were joined by the two fathers, Le Blanc and Jeffery. A conversation between the fathers and the rangers ensued. There is a conflict in the evidence as to the nature of the conversation. The rangers recall that they advised the fathers that if they wanted to do "off-road" riding, they should go outside the park area; that there were abandoned mines in the area that were dangerous. The fathers' recollection was that if they wanted to ride, they should take a left turn a short distance from the campgrounds area to a dirt road; that there were abandoned mines in the area that they might want to look at.

In any event, the two fathers concluded that prior to their departure for home they would give the boys a short ride on the motorcycles. With Le Blanc and Timothy in the lead and Jeffery and Douglas following, the two fathers proceeded to the turn off at the dirt road. The turn off was approximately one-half mile from the camp site. The two fathers and their sons then proceeded another one-half mile to a county road (still within the park area) along the county road approximately one-fourth mile, and then turned left on a dirt road bordering the tailings pile of the abandoned Treasure Vault mine.

The tailings pile of the Treasure Vault mine was approximately 256 feet long on its north/south axis, and varied in width on the east/west axis from about 30 feet on the northerly end to about 55 feet on the southerly end. The natural topography of the area slopes downward from south to north. The top of the tailings pile was level. The northerly end was approximately 16 feet in height and the extreme southerly end was approximately ground level. At the northerly end of the tailings pile there was a framed lateral hole in the tailings 6 feet 6 inches high by 5 feet 8 inches wide and 4 feet 8 inches in depth. This hole had been boarded up, barring entrance thereto. 40 feet north of the southerly limit of the tailings pile there was a funnel type structure. The perimeter of the saucer of the funnel was at the level of the top of the tailings pile, and was approximately 30 feet in diameter. The sides of the saucer had been heavily eroded downward toward the stem of the funnel, which was a 165-foot vertical mine shaft. The opening to the mine shaft was 6 feet 8 inches north to south by 10 feet 6 inches east to west. The saucer and shaft were not visible until one reached the top of the tailings pile. Across the open shaft (the stem of the funnel) were three 12-inch by 12-inch timbers placed horizontally in a north/south direction.

As Le Blanc and Jeffery, each with his son behind him, traveled along the dirt road (obviously the road that had at one time been used to service the mine) they traveled along the easterly side of the tailings pile. At a point where the berm of the tailings pile was approximately 3 feet in height, Le Blanc drove up to the top of the pile. Both motorcycles were traveling about 5 miles per hour, or slightly more, at this point. Le Blanc reached the top of the tailings pile on the north side and adjacent to the saucer. Jeffery, following, ascended the 3-foot berm a little to the left or south of Le Blanc. As Le Blanc saw the saucer and shaft, he stopped waved and grasped at Jeffery's motorcycle. At the point Jeffery ascended the berm, there was a 7-foot lip from the edge of the tailings pile to the steep saucer. Jeffery's momentum carried him into the saucer. Le Blanc's grasp failed to stop Jeffery. Jeffery attempted to stop and, indeed, was successful in laying the mo-

torcycle on its side. Jeffery continued to slide down the saucer, and as he reached the shaft opening grasped the near timber and stopped his descent. At the same time Jeffery was attempting to catch Douglas, who was also sliding down the saucer. In this attempt Jeffery failed. Douglas slid under the timber and dropped 165 feet to his death.

The physical evidence in the case as adduced at trial discloses a virtually classical example of a "hidden peril."

That the National Park Service was fully informed of the existing danger cannot be questioned. On January 19, 1969, the Subdistrict Park Ranger at Katherine submitted a report to the Chief Park Ranger, through the District Park Ranger Station, Mohave, the relevant portions of which follow:

"UNITED STATES GOVERNMENT Memorandum    DATED: January 19, 1969

TO: Chief Park Ranger

FROM: Subdistrict Park Ranger, Katherine

SUBJECT: Mine Shaft Survey, Katherine Subdistrict

Following is the subject survey for this subdistrict. We expanded the scope of this survey to include all shafts which are easily accessible, either by vehicle or boat. We have located the shafts to the nearest 10 acres and have attached a photograph for each shaft described. Shaft numbers in the description refer to the photograph number. The shaft dimensions are length x width x depth in feet. The shafts are grouped by locality and are vertical unless otherwise noted.

In addition to the 21 hazardous shafts described, we have checked an additional 125 adits and prospect holes. Most of the working mines and deep exploratory shafts and adits are in the Golden Door rhyolitic volcanics or in the highly metamorphosed Pre-Cambrian genisses, shists, and granitics. In the alluviums, there are a multitude of prospect holes, but none of any significance as far as being hazardous.

Katherine Utility Area Vicinity:
1. * * *

Katherine Mine Vicinity:
3. * * *
4. SW¼ of the SW¼ of the NW¼, section 4, T21N, R21W 100 yards N of Katherine Mine Entrance Road and located in tailings which are very visible. A 30x30 caving pit sloping to a 21x12x200 plus shaft. There is active caving on the edge of the pit. The pit can be walked upon unsuspectedly. Shown as a mine on the Davis Dam 15 minute topographic quadrangle and is probably the Treasure Vault Mine.
5. * * *
6. through 21. * * *

As we have indicated, several of these shafts are exceedingly dangerous to the public because of their depth, accessibility, or danger of caving. Others, while inherently dangerous, do not offer as much hazard to the public. In this vein, we offer the following preventive recommendations. Because of the danger of caving, shafts 3, 4, 5, 6, and 16 should be fenced and posted with danger signs. Mere posting of danger signs should suffice for shafts 9, 10, 11, 12, 13, 14, and 15. Shafts 8 and 17 should be covered with a prestressed concrete cap. Shafts 2, 7, 13, 18, 19, 20, and 21 probably do not need any preventive action at this time, although they too might be posted with danger signs. Shafts 18, 19, 20, and 21 should be left undisturbed as this area would make an excellent interpretive tour and walk.

Shaft 1, * * *

While not in the area, * * *

We would be pleased to show you any or all of these shafts and to discuss preventive measures on the site.

Richard T. Gale"

(Plaintiff's Exhibit No. 38)

The Arizona Legislature is and has been fully aware of the inherent dangers incident to working and abandoned mines. § 27–318 A.R.S. provides:

"§ 27–318. *Abandoned shafts; fencing; violation*

All abandoned shafts, prospect holes or other excavations endangering life or safety shall be securely covered, fenced or otherwise protected and warning signs posted. Any person removing or destroying any warning sign, covering, fencing, or other protection placed on or around any shaft, prospect hole or other excavation is guilty of a misdemeanor as provided in § 27–302."

§ 27–363 A.R.S. provides:

"§ 27–363. *Danger signals; visitors*

A. Notices shall be placed at the entrance to working places deemed dangerous, and at the entrance to old or abandoned workings, and no person other than those authorized by the operator, shall remove or go beyond a caution-board or danger signal so placed.

\* \* \* "

Within the perimeter of the Lake Mead Recreation Area there are several privately owned parcels of land upon which are located dwellings or cabins. One such parcel is in relatively close proximity to the abandoned Treasure Vault mine. Mr. John C. Grounds, whose family has lived in the area for approximately 75 to 100 years, has a dwelling on this parcel. Mr. Grounds' uncontradicted testimony was that he had frequently noticed dune buggies and motorcycles traveling about the vicinity of the Treasure Vault mine.

▮ From the evidence adduced at trial, it is apparent that the condition of the abandoned Treasure Vault mine, as it existed at the time of the accident under consideration, was in fact a concealed or hidden danger or peril. Under these circumstances, it makes no difference whether Le Blanc and Jeffery were invitees or licensees. In the instant case the National Park Service knew of the dangerous condition existing at the Treasure Vault mine. Under these circumstances, the owner or occupant of land has a duty to exercise reasonable care to correct the danger, or at least to give adequate warning and notice of the existence of the danger. Restatement of Torts (2) 342; Sanders v. Brown, 73 Ariz. 116, 238 P.2d 941; Shannon v. Butler Homes, Inc., 102 Ariz. 312, 428 P.2d 990; Heth v. Del Webb's Highway Inn, 102 Ariz. 330, 429 P.2d 442; State v. Juengel, 15 Ariz.App. 495, 489 P.2d 869.

▮ The purported "notice", supra, posted at the Ranger Station bulletin board and upon the bulletin board at the confort station concerning the regulation of vehicular traffic was entirely inadequate to advise Le Blanc and Jeffery of the condition they or anyone might encounter at the Treasure Vault mine. The conversations between Le Blanc, Jeffery and the park rangers was equally inadequate. At Treasure Vault mine, the truly hazardous place, there was absolutely no warning, no notice, no fences, nothing to advise approaching walkers, bicyclists, motorcyclists nor anyone else of the imminent grave danger there existing.

The National Park Service owed a duty to the users of the Lake Mead Recreation Area to maintain the premises in a reasonably safe condition. This the National Park Service failed to do. The National Park Service owed a duty to the users of the Lake Mead Recreation Area to give notice and to warn of the hidden dangers existent upon the premises. This the National Park Service failed to do.

The failure of the National Park Service to perform its aforesaid duties constituted negligence. The death of Douglas Jeffery was the proximate result of the negligence of the National Park Service. Neither Victor R. Jeffery, Douglas Jeffery nor Theodore Le Blanc was contributorily negligent.

It is clear from the evidence adduced at trial that Victor Jeffery did every-

thing humanly possible to save his son. This fact, however, in no way relieves Victor Jeffery nor his wife, Margaret, from the severe shock, mental anguish and tremendous grief in the loss of their only son as a result of this tragedy.

The next issue to be resolved is the amount of damages to be awarded. The law of Arizona is controlling on the measure and amount of damages in the resolution of this issue. Brooks v. United States, D.C., 273 F.Supp. 619; Bartch v. United States, 330 F.2d 466.

 § 12–613 A.R.S. provides that the damages to be awarded in a wrongful death action shall be in an amount which shall be "fair and just" to the surviving parties entitled to recover. The measure of damages includes allowance for loss of companionship, comfort and guidance. Boies v. Cole, 99 Ariz. 198, 407 P.2d 917. In Arizona, in assessing damages, it is appropriate to consider in a case such as the instant case "anguish, sorrow, stress, mental suffering, pain, and shock." City of Tucson v. Wondergem, 105 Ariz. 429, 466 P.2d 383. In the instant case, Margaret Jeffery was required to seek medical attention as a result of the shock and grief in the loss of her son, Douglas. Moreover, the evidence at trial disclosed that the resulting shock, the tragedy, the grief and sorrow of both parents nearly resulted in the dissolution of their marriage status. Approximately four years after this tragedy, it was apparent to the trial court that both parents were still suffering from their unwarranted loss.

It is difficult, at best, to assess damages for personal injuries, pain and suffering. It is even more difficult to put an amount in dollars upon the loss to parents of the life of a husky, healthy, eight-year old boy, an only son. It is obvious that to the parents who suffered the loss, no dollar amount can be adequate. Plaintiffs suggest the sum of Two Hundred Fifty Thousand Dollars ($250,000) would be reasonable under the circumstances. Hopefully the passage of time will assuage, to some degree, the suffering these parents have experienced, are presently experiencing, and will continue to experience.

The foregoing opinion constitutes the findings of fact and conclusions of law prescribed by Rule 52 Federal Rules of Civil Procedure.

Wherefore, it is ordered, adjudged and decreed that plaintiffs shall have judgment against the defendant in the amount of One Hundred Thirty-five Thousand Dollars ($135,000), together with costs of suit as may be provided by law.

Counsels' attention is directed to Title 28 U.S.C. § 2678, as amended.